**GOLD KIST INC., Plaintiff,**

v.

**CONAGRA, INC., d/b/a ConAgra Foodservice, Defendant.**

**Civ. A. No. 1:87–CV–2558–MHS.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 8, 1989.

---

Martin J. Elgison, Jay D. Bennett, Alston & Bird, Atlanta, Ga., Arthur Schwartz, phv, Schwartz Jeffery Schwaab Mack Blumenthal & Evans, Alexandria, Va., for plaintiff.

Thomas Willard Rhodes, Smith Gambrell & Russell, Atlanta, Ga., John P. Passarelli, phv, McGrath North O'Malley & Katz, Omaha, Neb., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHOOB, District Judge.

An evidentiary hearing was held in this case on October 27, 1988 to determine whether plaintiff, Gold Kist Inc. ("Gold Kist") is entitled to a permanent injunction against ConAgra, Inc.'s ("ConAgra") use of the label "Golden Medallion" for its processed chicken products. Gold Kist alleges that ConAgra's label violates both Sections 32(1) and 43(a) of the Lanham Act, 15 U.S. C. §§ 1114(1) and 1125(a), respectively. Plaintiff also asserts that defendant engaged in deceptive and unfair trade practices and false advertising in violation of Georgia law and common law trademark infringement.

## FINDINGS OF FACT

Plaintiff Gold Kist is a nonprofit cooperative marketing corporation with its principal place of business in Atlanta, Georgia. Gold Kist is, among other things, an inte-

grated poultry producer and marketer with feedmills, processing plants and distribution centers.

ConAgra is a Delaware corporation with its principal place of business in Omaha, Nebraska. ConAgra is, like Gold Kist, an integrated producer and marketer of poultry products. ConAgra's net sales for the fiscal year ending May 31, 1987, were approximately 9 billion dollars. ConAgra Foodservice Company ("CFS") is a division of ConAgra, Inc., with its principal offices in Baldwin, Missouri. (ConAgra and CFS are hereinafter referred to collectively as "ConAgra".)

Gold Kist is the owner by assignment of the trademark MEDALLION. The MEDALLION trademark is registered on the Principal Register of the United States Patent and Trademark Office ("USPTO") as Reg. Nos. 802,798 (for frozen dressed turkeys) and 968,737 (for frozen dressed poultry), dated January 26, 1966, and September 18, 1973, respectively. The trademark MEDALLION and the registrations thereof were assigned to Gold Kist by Ralston Purina Company by means of a written Assignment dated October 28, 1977, recorded in the records in the USPTO. Gold Kist and its assignor have filed with the USPTO all appropriate renewal documents and affidavits of use, and the registrations for MEDALLION are in full force and effect.

Since it acquired the MEDALLION trademark in 1977, Gold Kist has made extensive and continuous use of the mark. Gold Kist's sales of poultry products under the MEDALLION trademark have exceeded $55,000,000 since 1977. Its sales of products under the MEDALLION mark in its most recent fiscal year were more than $22,000,000.

Gold Kist currently uses the trademark MEDALLION to identify various poultry products produced and sold by Gold Kist, including further processed poultry items, rock cornish hens and prepackaged chilled chicken parts. Gold Kist licenses Cargill Inc. to use the MEDALLION mark on fresh frozen dressed turkeys produced and sold by Cargill. Pursuant to the terms of the license agreement, Gold Kist exercises control over the quality of the goods sold by Cargill under the MEDALLION trademark.

"Further processed" poultry is generally defined as poultry which has had something done to it after it has been cleaned and eviscerated, i.e., poultry which has been de-boned, battered, breaded, precooked, processed and re-formed, or any combination of the foregoing. Further processed poultry sold by Gold Kist under the MEDALLION mark is always sold in a frozen state and packed in boxes. The boxes bear the MEDALLION label and are not repacked or repackaged by the distributor before sale to operators or customers of the distributor. The further processed poultry items sold by Gold Kist under the MEDALLION trademark include breaded chicken patties, breaded chicken nugget patties and chicken fritters.

The first further processed poultry items sold by Gold Kist under the MEDALLION mark were chicken hotdogs and chicken bologna in 1978. Although the sales of further processed poultry items have been relatively minor in the past, plaintiff produced evidence that it intends to expand this line in the future. In 1985, Gold Kist expanded its plant at Boaz Alabama at a cost of approximately $6,000,000 so that Gold Kist could produce further processed poultry.

Also, Gold Kist produced evidence of plans to expand its operations in the further processed poultry product market segment, and plans to expand both the volume and number of further processed poultry items sold under the MEDALLION trademark. Gold Kist has already begun construction of an expansion to its further processed poultry plant in Boaz. The construction is designed to double Gold Kist's capacity to produce further processed poultry and is expected to be completed in April, 1989.

Gold Kist also sells chilled, prepacked chickens and chicken parts under the MEDALLION trademark. The full product line of chill pack items sold under the MEDALLION brand contains approximately 30–35 items. The primary parts sold under

the MEDALLION label are breasts, drums, thighs, and wings. Gold Kist sold approximately 20–22 million pounds of chilled, prepackaged chicken parts under the MEDALLION trademark in fiscal year 1987, representing sales of approximately $15 million.

Gold Kist also markets frozen rock cornish game hens under the MEDALLION trademark. Gold Kist has been selling rock cornish hens under the MEDALLION trademark since October of 1977, when Gold Kist acquired the trademark from Ralston Purina Company. In the last twelve months, Gold Kist's estimated sales of rock cornish game hens under the MEDALLION trademark were approximately $7,000,000.

Gold Kist advertises the MEDALLION trademark extensively and through a variety of methods, although most of its advertising is aimed at retail purchasers. Gold Kist engages in cooperative advertising by providing promotional allowances to its customers for promotion by customers of the MEDALLION brand product. The customers may use "ad slicks" provided by Gold Kist reflecting the MEDALLION trademark in print advertisements generated by the customer. Advertising by customers of Gold Kist is done in print advertising such as local newspapers, as well as some advertising on television and radio. Gold Kist also uses point of sale promotional pieces that identify and illustrate the products sold under the MEDALLION trademark and how they can be purchased.

In addition, Gold Kist has produced a cookbook entitled "Elegant & Easy" which depicts the MEDALLION trademark on the cover and describes various methods for preparing and serving rock cornish hens. Approximately 30,000 copies of the cookbook have been printed, and approximately 10,000 have been distributed. Among other things, the cookbooks have been provided to restaurants for ideas on how to prepare cornish hens. Gold Kist also advertises MEDALLION through the use of discount coupons to be redeemed by customers.

The products sold by Gold Kist under the MEDALLION trademark are sold through various channels of trade and distribution. Further processed poultry items are sold, through the efforts of Gold Kist salesmen and independent food brokers, to distributors, which in turn sell primarily to foodservice operators such as restaurants and restaurant chains, fast food restaurants, hotels and hotel chains, public and private schools and school systems, airlines, prisons, and other types of institutional buyers. Distributors also sell MEDALLION brand further processed poultry products to retail customers such as supermarkets or grocery stores, and to delicatessens.

Chill pack products sold under the MEDALLION mark are sold either directly to supermarkets or to distributors which sell to supermarkets. Approximately 75% is sold directly to supermarkets, while the other 25% is sold to distributors which deliver the product to independently owned supermarkets or grocery stores.

Rock cornish game hens sold by Gold Kist under the MEDALLION trademark are sold through distributors primarily to retail outlets such as supermarkets or grocery stores. Approximately 11% of the frozen rock cornish game hens sold by Gold Kist under the MEDALLION mark are sold to foodservice distributors. There are no restrictions on the methods of distribution which Cargill can use to sell MEDALLION brand turkeys.

Because a certain percentage of the poultry produced by Gold Kist will vary by "grades", the MEDALLION trademark is a crucial marketing tool for Gold Kist in the sale of poultry products. As a result of Gold Kist's continuous and extensive use of the MEDALLION mark, the mark has become closely associated in the minds of Gold Kist's customers with Gold Kist and the products sold by Gold Kist under the mark. Customers of Gold Kist often request MEDALLION brand poultry products specifically, as opposed to poultry sold under Gold Kist's other brands.

In late 1986 ConAgra made the decision to develop a new brand name or trademark to replace the BANQUET trademark in certain segments of the marketplace. ConAgra was provided with a list of 25–30 dif-

ferent names by its advertising agency. GOLDEN MEDALLION was not one of those original names, but was developed as a result of discussions between personnel at ConAgra and ConAgra's advertising agency.

On or about October 14, 1986, ConAgra's counsel contacted Thomson & Thomson, an independent firm which specializes in trademark searches. Shortly thereafter, Thomson & Thomson generated a Trademark Search Report which was received by ConAgra's counsel. The Trademark Search Report revealed Gold Kist's Registration Nos. 802, 798 and 968,737 for the MEDALLION trademark. ConAgra's counsel did not inform ConAgra of the results of the Search Report or of the existence of Gold Kist's registrations.

ConAgra decided in late 1986 to adopt the trademark GOLDEN MEDALLION for certain poultry items. On or about November 23, 1986, ConAgra introduced the GOLDEN MEDALLION brand to its brokers for the first time. Throughout late 1986 and early 1987 ConAgra continued expansion of the GOLDEN MEDALLION trademark on various frozen poultry products.

The products currently marketed by ConAgra under the GOLDEN MEDALLION trademark include frozen, breaded chicken nuggets; frozen, breaded chicken patties; raw breaded breast fillets; raw breaded or fully-cooked battered and breaded breast tenderloins; individually quick-frozen raw chicken parts; pre-browned Chicken Kiev; pre-browned Chicken Cordon Bleu; pre-browned Chicken Kerri; and fully-cooked fried chicken.

All of the processed poultry items sold by ConAgra under the GOLDEN MEDALLION trademark are frozen and packed in boxes. The boxes bear the GOLDEN MEDALLION label, and are not repacked or repackaged by the distributor before sale to the distributor's customers.

ConAgra advertises its GOLDEN MEDALLION trademark in much the same manner as Gold Kist advertises MEDALLION. ConAgra uses point of sale product sheets which are given to distributors or operators. ConAgra uses brokers to promote the GOLDEN MEDALLION trademark. ConAgra also engages in cooperative advertising with distributors for promotions and advertising of the GOLDEN MEDALLION trademark. Most of ConAgra's advertising, however, is directed at food service distributors and operators.

ConAgra sells its poultry products identified by the GOLDEN MEDALLION trademark to distributors, which in turn sell primarily to foodservice operators, although they may also sell to retail outlets such as club stores. The foodservice operators include restaurants and restaurant chains, fast food restaurants, caterers, hotels, airlines, hospitals, stadiums, banquet halls, or even large corporations which have their own in-house cafeterias. Some GOLDEN MEDALLION products sold by ConAgra, including frozen, raw chicken parts, are sold in retail outlets such as club stores or small grocery stores.

Gold Kist and ConAgra sell their MEDALLION and GOLDEN MEDALLION brand products to many of the same distributors. At least 61 distributors are customers of both Gold Kist and ConAgra.

On or about June 9, 1987, Jack L. Lawing, Vice President—Law & Corporate Secretary of Gold Kist, wrote to Don Blumenthal, Vice President and General Manager of ConAgra. Mr. Lawing informed Mr. Blumenthal of Gold Kist's ownership of the MEDALLION trademark and the federal registrations thereof, and requested that ConAgra cease further use of the GOLDEN MEDALLION trademark. On or about June 30, 1987, Richard A. Compare, representing ConAgra as counsel, wrote to Mr. Lawing and indicated that ConAgra would not cease further use of the GOLDEN MEDALLION trademark.

In the meantime, in early 1987 ConAgra had applied to the United States Patent and Trademark Office to register the GOLDEN MEDALLION trademark for "frozen poultry." On or about July 24, 1987, Gold Kist filed in the USPTO a Notice of Opposition opposing the registration of GOLDEN MEDALLION. On the motion of Gold Kist,

the opposition proceeding has been suspended pending the outcome of this case.

Gold Kist then commenced this action against ConAgra. In its complaint, Gold Kist alleges that ConAgra is liable for: (1) trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); (2) false designation of origin, false description and false representation in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) deceptive trade practices in violation of O.C.G.A. § 10–1–370 *et seq.;* (4) unfair trade practices in violation of O.C.G.A. § 10–1–390 *et seq.;* (5) false advertising in violation of O.C.G.A. § 10–1–421; and (6) common law trademark infringement. Gold Kist seeks a permanent injunction, an accounting of ConAgra's profits, damages, both actual and punitive, and attorney fees and costs.

For the reasons set forth more fully in the accompanying Conclusions of Law, the Court finds that ConAgra's use of the trademark GOLDEN MEDALLION creates a likelihood of confusion, mistake or deception with Gold Kist's MEDALLION trademark.

## CONCLUSIONS OF LAW

The Court has jurisdiction over Gold Kist's claims brought under the Lanham Act under 15 U.S.C. § 1121, and 28 U.S.C. § 1338(b). Jurisdiction over the state law causes of action is based on the pendent jurisdiction of the Court. Venue is proper in this district under 28 U.S.C. § 1391.

Gold Kist's right to use the MEDALLION trademark in interstate commerce is incontestable under 15 U.S.C. §§ 1065 and 1115(b).[1] Gold Kist's registration of the MEDALLION trademark constitutes nationwide constructive notice of Gold Kist's claim of ownership of the mark under 15 U.S.C. § 1072.

Gold Kist's claim for infringement of its federally registered trademark MEDALLION is governed by § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). *See John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir.1983). ConAgra is liable for trademark infringement if, without the consent of Gold Kist, it has used " 'in commerce any reproduction, counterfeit, copy, or colorable imitation of [Gold Kist's] registered mark' which 'is likely to cause confusion, or to cause mistake, or deceive.' " *Id.* (quoting Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)). Because Gold Kist's ownership of and exclusive right to use the MEDALLION trademark are undisputed, the dispositive question in this case is whether there is a likelihood of confusion, mistake, or deception between Gold Kist's registered mark MEDALLION and ConAgra's GOLDEN MEDALLION trademark. *John H. Harland,* 711 F.2d at 972. The question of whether there is a likelihood of confusion is a question of fact. *Harland,* 711 F.2d at 972–973.

The Eleventh Circuit has identified certain factors which should be considered when analyzing whether there is a likelihood of confusion between two marks. *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1530 (11th Cir.1985). These factors include: (1) the type of trademark; (2) the similarity of designs; (3) the similarity of products; (4) the identity of retail outlets and purchasers; (5) the similarity of advertising media used; (6) the defendant's intent; and (7) actual confusion. *Id.* The Court may also consider other probative evidence that does not fit within the enumerated factors in reaching its conclusion. *See Swatch Watch, S.A. v. Taxor, Inc.,* 785 F.2d 956, 958 (11th Cir.1986). No factor is pre-eminent, nor is the existence or lack of any one factor determinative of the outcome of an infringement action. *Thompson Medical*

---

1. Gold Kist's rights to the MEDALLION trademark are not limited to the goods specified in the certificates of registration, but extend to "any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods." *E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc.,* 756 F.2d 1525,

1530 (11th Cir.1985). *See also Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 389 (5th Cir.1977); *Pure Foods, Inc. v. Minute Maid Corp.,* 214 F.2d 792, 796 (5th Cir.), *cert. denied,* 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697 (1954).

*Co., Inc., v. Pfizer, Inc.,* 753 F.2d 208, 214 (2d Cir.1985). Once these factors are analyzed, the Court must weigh them as a whole to determine if there is a likelihood of confusion. *Remy Martin,* 756 F.2d at 1533.

## A. *Type of Trademark*

The first factor is whether MEDALLION is a "strong" or "weak" trademark. The strength and distinctiveness of Gold Kist's mark is an important consideration in determining the scope of protection that it should be accorded. If the mark is "strong," it is entitled to broad protection. *Harland,* 711 F.2d at 973.

The factors to consider in determining whether a trademark is strong or weak include (i) the type of trademark, i.e., whether the mark is "arbitrary" or "fanciful," "suggestive" or "merely descriptive"; (ii) the amount of use of the term by others in the same product and geographical area; and (iii) consumer recognition of the mark based on the extent of its use, the amount of advertising and promotion done under the mark. *See Harland,* 711 F.2d at 973–75.

Gold Kist maintains that the MEDALLION trademark is a "strong" mark because (a) it is arbitrary (in that it has no inherent relationship to the products with which it is associated)[2] and (b) Gold Kist has used the mark continuously and extensively for a lengthy period of time and has spent considerable sums of money advertising and promoting the mark. As a result, Gold Kist contends, the mark has substantial consumer recognition and association with Gold Kist.

An arbitrary mark is a "word in common use, but applied to a product or service unrelated to its meaning, so that the word neither describes nor suggests the product or service...." *Jellibeans Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 841 n. 18 (11th Cir.1983) (quoting *Tisch Hotels,*

**2.** ConAgra argues that the mark is merely descriptive or laudatory and therefore is inherently weak. The registration of the mark, however, creates a presumption that the mark is suggestive rather than merely descriptive. *Aber-*

*Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 611 n. 2 (7th Cir.1965)). Contrary to ConAgra's assertion, MEDALLION fits this definition; it is a common word, and there is no evidence to support the contention that the mark either describes or suggests any characteristic or quality of the products it identifies. Webster's Dictionary defines medallion simply as a "large medal." Webster's Third New International Dictionary (1976). Thus the choice of the term medallion merely indicates an impression of quality; it does not in any way suggest the product being sold or any specific trait of the product. As an arbitrary mark, the MEDALLION trademark is inherently distinctive and is afforded the widest ambit of protection. *See Harland,* 711 F.2d at 974.

The extent to which the MEDALLION mark has been promoted and the length of time it has been in use also lend "strength" to the mark. *See Remy Martin,* 756 F.2d at 1533; *Harland,* 711 F.2d at 974 n. 13. The evidence showed that the MEDALLION trademark enjoys a high degree of customer recognition as a result of (i) the importance of the trademark in Gold Kist's marketing efforts, (ii) the large volume of products sold under the mark, and (iii) Gold Kist's extensive promotion and advertising of the mark. Many of Gold Kist's customers specifically request MEDALLION brand products. Thus, even if the Court were to conclude that MEDALLION is "laudatory," it would find that the MEDALLION trademark is a "strong" mark as a result of these promotional efforts and Gold Kist's extensive use of the mark. *See Jellibeans,* 716 F.2d at 841; *John Harland,* 711 F.2d at 974 n. 13.

ConAgra asserts that the MEDALLION mark is "weak" because of simultaneous use of the mark by third parties. In support of its argument, ConAgra introduced evidence of existing registrations in the U.S. Trademark Office for the trademark MEDALLION (Def. Ex. 23). However, ConAgra did not present any evidence to

*crombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir.1976). Therefore, even if the mark were not arbitrary, it would still be entitled to more protection than would a merely descriptive mark.

show that the owners of the registrations are actually using the marks currently.

It is well-established that ConAgra must introduce more than mere copies of registrations or pending applications. Instead, ConAgra must introduce evidence which clearly establishes that these alleged third-party marks are in fact in use. *See Turner v. H M H Publishing Co.*, 380 F.2d 224, 228 (5th Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967); *Miss Universe, Inc. v. Little Miss USA, Inc.*, 212 U.S.P.Q. 425, 429 (N.D.Ga.1981). Because ConAgra failed to do so, the Court gives little weight to the alleged third-party uses upon which ConAgra relies.

Even if the Court were to seriously consider the third-party uses upon which ConAgra relies, ConAgra has not shown that any of those uses are on goods which are closely related to the goods at issue here. "Use of the same or similar marks by third parties in unrelated businesses does not diminish the distinctiveness of a mark in a particular field." *American Auto. Ass'n (Inc) v. AAA Ins. Agency, Inc.*, 618 F.Supp. 787, 792 (W.D.Tex.1985) (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1165 (11th Cir.1982)).

Here, ConAgra has not presented evidence of any uses of the same or similar marks by third parties in any related business or on similar goods. While some of the uses introduced by ConAgra are on food products, none is used in connection with poultry or meat products, and none of the companies which use the marks is in direct competition with Gold Kist. Thus, even if the Court were to give weight to ConAgra's evidence, none of the uses cited by ConAgra would diminish the strength of Gold Kist's MEDALLION trademark.

ConAgra relies on *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980), for the proposition that the third-party registrations introduced by ConAgra limit the protection af-

forded to Gold Kist's MEDALLION trademark. Even if the Court were to accept ConAgra's argument, the *Amstar* court merely held that the extensive third-party uses at issue there entitled the plaintiff's "DOMINO" mark to only limited protection outside the markets for its sugar and related food products. Here, Gold Kist is not seeking to extend protection of its mark outside the area of poultry products. As shown more fully below, many of the goods sold by ConAgra under the GOLDEN MEDALLION mark are identical to the goods sold by Gold Kist under the MEDALLION trademark. The *Amstar* case is thus inapposite.

The *Amstar* case is further distinguished from this case in the number of third-party registrations of the mark "Domino" in the U.S. Patent Office. *Amstar*, 615 F.2d at 259. In addition, defendants presented extensive evidence of 15 third-party uses of the Domino mark from 1885 until the present. In contrast, ConAgra presented evidence of only 7 unexpired or unabandoned registrations or applications in the U.S. Trademark Office for the trademark MEDALLION. (*See* Def. Ex. 23.)[3]

Thus, based on the evidence presented at trial, the Court concludes that Gold Kist's MEDALLION trademark is a strong mark which is entitled to broad protection. *See Jellibeans*, 716 F.2d at 841. Even if the Court were to conclude that Gold Kist's MEDALLION trademark is relatively "weak" because of the third-party uses, the Court finds that any limitation on Gold Kist's right to protect its mark would be inapplicable to this case because the products involved are closely related. Moreover, even if the MEDALLION mark were found to be weak, ConAgra's use of the GOLDEN MEDALLION mark would still, for the reasons discussed below, create a likelihood of confusion. *Harland*, 711 F.2d at 974.

B. *Similarity of Design or Marks*

In evaluating the similarity of the trademarks at issue here, the Court "must con-

---

**3.** For the same reasons, *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Association*, 651 F.2d 311 (5th Cir.1981) (4400 users) and *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir.), *cert. denied*, 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979) (85 users) are not applicable.

sider the overall impression created by the marks, including a comparison of the appearance, sound, and meaning of the marks, as well as the manner in which they are displayed." *Remy Martin,* 756 F.2d at 1531. The evidence showed that the trademarks at issue here are extremely similar in all respects.

The marks are obviously very similar in sight, sound, and meaning, since ConAgra's trademark encompasses all of Gold Kist's MEDALLION trademarks. (Plf. Exs. 30 and 39.) Furthermore, the word MEDALLION is the distinctive aspect of ConAgra's mark—the word "GOLDEN" is quite common and lends no distinctiveness to ConAgra's trademark. *See Safeway Stores,* 675 F.2d at 1165–66. *ConAgra v. Singleton,* 743 F.2d 1508, 1514 (11th Cir. 1984).

ConAgra's use of the word "GOLDEN" in conjunction with MEDALLION not only fails to distinguish ConAgra's trademark from Gold Kist's mark, but in fact increases the likelihood of confusion between the marks. The most obvious reason is the use of the word "Gold" in the name Gold Kist. Moreover, Gold Kist licenses its subsidiary, Golden Poultry Co., to use the MEDALLION trademark, and is the owner of numerous federally registered trademarks containing the words "Golden" or "Gold." Thus, ConAgra's use of the word "GOLDEN" emphasizes, not deemphasizes, a connection between ConAgra and Gold Kist.[4]

The similarity between the marks is also found in the designs with which the marks are commonly associated. Both of those designs involve a similar background. A side-by-side comparison of the marks as they are used on labels and packaging clearly shows that they create a very similar overall commercial impression in the minds of consumers. (*Compare* Plfs. Exs. 40 and 49–56.) *See Exxon Corp. v. Texas Motor Exch. of Houston, Inc.,* 628 F.2d 500, 504–05 (5th Cir.1980). The fact that plaintiff's "Medallion" name is imprinted over a gold colored medal makes the labels confusingly similar.

The manner in which the two trademarks are displayed is also very similar. Both marks are used on labels which are affixed to the boxes in which the goods are packaged; the marks appear on cooperative advertisements used by distributors; the marks appear on point of sale promotional literature such as fliers and product sheets; and the marks are utilized by the food brokers who act as independent salesmen for the sale of products under both the GOLDEN MEDALLION and MEDALLION trademarks. This similarity of method of display enhances the similarity between the marks. *See Remy Martin,* 756 F.2d at 1531; *Harland,* 711 F.2d at 976.

In sum, the inescapable conclusion is that Gold Kist's MEDALLION trademark and ConAgra's GOLDEN MEDALLION trademark create a very similar overall commercial impression. This factor therefore weighs strongly in favor of a likelihood of confusion.

### C. *Similarity of Products*

The evidence showed that ConAgra and Gold Kist sell the same product—frozen poultry—under their respective marks. Although ConAgra argued that its sales under the GOLDEN MEDALLION trademark are of further processed poultry items and that Gold Kist's sales under the MEDALLION trademark are of different products, the evidence showed otherwise. *First,* ConAgra's application to register the GOLDEN MEDALLION trademark in the Trademark office covers exactly the same products covered by Gold Kist's registration: "frozen poultry." *Second,* the evi-

---

**4.** ConAgra's citation to cases in which courts have found no infringement despite the existence of identical (or nearly identical) marks is unavailing. For every case cited by ConAgra, there are numerous trademark or service mark infringement cases where similar but not identical marks *have* resulted in a finding of a likelihood of confusion. *See, e.g., Grey v. Campbell Soup Co.,* 650 F.Supp. 1166 (C.D.Cal.1986), *aff'd,* 830 F.2d 197 (9th Cir.1987), (DOGIVA mark for dog biscuits confusingly similar to GODIVA on chocolates for human consumption); *Pedi–Care, Inc. v. Pedi–A–Care Nursing, Inc.,* 656 F.Supp. 449 (D.N.J.1987) (PEDI–A–CARE mark for home health care services found to be confusingly similar to PEDI–CARE for home pediatric health care and nursing services).

dence showed that Gold Kist sells further processed poultry items under the MEDALLION trademark which are identical to the products ConAgra sells under the GOLDEN MEDALLION trademark. Specifically, both Gold Kist and ConAgra sell frozen breaded chicken patties and breaded chicken nuggets under their respective marks. The only difference between the products is a very small difference in the percentage of breading. Thus, even if the Court were to view ConAgra's arguments in the best light, it would still find that the products sold by Gold Kist under the MEDALLION mark are so closely related to the products sold by ConAgra under the GOLDEN MEDALLION trademark that any difference between them is negligible. *See Exxon,* 628 F.2d at 505 (strong similarity found between the plaintiff's petroleum products and the defendant's automotive repair services and sales of automotive parts).

In any event, it is not necessary for Gold Kist to establish that its MEDALLION trademark and ConAgra's GOLDEN MEDALLION trademark are used on identical products. "The question ... is not whether the purchasing public can readily distinguish [the products] but whether the products are the kind the public attributes to a single source." *Remy Martin,* 756 F.2d at 1530. *See also Safeway Stores,* 675 F.2d at 1166. The goods involved here—poultry products—are indisputably the kind the public attributes to a single source.

Even if the Court were to accept ConAgra's arguments, Gold Kist established at trial that it was likely to "bridge the gap" (if any exists) between its products and ConAgra's products. The term "bridging the gap" refers to the senior user's (Gold Kist) interest in preserving avenues of expansion, including expansion into the junior user's field. *See C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985). "This is a factor militating in favor of the likelihood of confusion if, in a case where there are certain product differences, the senior user of a trademark proves an intent to expand its traditional activities and enter into a related field occupied by the junior user." *Inc. Publishing Corp. v. Manhattan Magazine, Inc.,* 616

F.Supp. 370, 385 (S.D.N.Y.1985), *aff'd,* 788 F.2d 3 (2d Cir.1986). At trial, Gold Kist presented undisputed evidence of its intent to expand its further processed operations and the number of further processed poultry products sold under the MEDALLION trademark. In fact, construction has already begun on the plant expansion, which is expected to be completed in April, 1989. Similarly, the evidence also showed that ConAgra plans to expand its use of the label GOLDEN MEDALLION.

There was undisputed testimony that the poultry industry is constantly changing and that Gold Kist's use of the MEDALLION trademark has evolved and is likely to continue to evolve. The evidence showed that the trend in the poultry industry is for the producer to do more and more and the consumer to do less and less with the products, making it likely that Gold Kist's sales of further processed poultry products will continue to expand in the future.

ConAgra and Gold Kist are two of the largest poultry concerns in the country. They have competed over a wide range of activities and products in the past and are certain to continue to compete with each other in the future. Furthermore, buyers are more brand-oriented now than they were previously, and brand identification of products is critically important to both Gold Kist and ConAgra. In fact, ConAgra's plans call for it to develop "brand loyalty" for the GOLDEN MEDALLION trademark. All of this evidence points to the conclusion that more direct competition between Gold Kist and ConAgra involving products sold under the MEDALLION and GOLD MEDALLION trademarks is "likely," thus increasing the likelihood of confusion.

In sum, the evidence showed that the products sold by Gold Kist under the MEDALLION trademark are similar to the products sold by ConAgra under GOLDEN MEDALLION. To the extent the products differ, Gold Kist established that it is likely to "bridge the gap" between them.

D. *Identity of Retail Outlets and Purchasers*

The evidence showed that Gold Kist and ConAgra sell their respective products to

identical purchasers: 61 distributors buy both MEDALLION and GOLD MEDALLION products.[5] Furthermore, both companies' products are sold by distributors to fast food operators, restaurants and private universities and school systems, and both companies' products are still packed in boxes bearing the GOLDEN MEDALLION and MEDALLION labels when they are delivered to the operator. Thus, the same operator could purchase boxes of ConAgra's GOLDEN MEDALLION product and boxes of Gold Kist's MEDALLION product.

ConAgra attempted to show at trial that *all* of its GOLDEN MEDALLION brand further processed poultry products are sold in the "foodservice" chain—first to foodservice distributors which in turn sell to foodservice operators—and that none is sold to retail outlets. ConAgra also attempted to show that all of the products sold by Gold Kist under the MEDALLION mark are sold in the "retail" chain—to distributors and ultimately on to supermarkets and grocery stores—and that none is sold in the foodservice chain. The evidence did not support ConAgra's contentions. Instead, the evidence showed that a significant amount of MEDALLION brand products is sold in the foodservice chain and that a portion of GOLDEN MEDALLION products is sold in the retail chain.

In any event, it is not necessary for Gold Kist to establish that it sells its MEDALLION brand products in precisely the same outlets and to precisely the same purchasers as ConAgra. *See, e.g., Safeway Stores,* 675 F.2d at 1166. In fact, even if ConAgra's factual assertions were accurate, under the test applied in this Circuit, there is an identity of purchasers here. *See Exxon,* 628 F.2d at 505. In the *Exxon* case, the court acknowledged that both the plaintiff and the defendant appealed to a wide variety of customers. Nevertheless, the court concluded: "These customers, however, all have one trait in common—they are members of the car driving public. They turn to the plaintiff and defendant in order to

keep their cars functional." 628 F.2d at 505. Here, Gold Kist's and ConAgra's customers also share a common trait—they buy, sell, or consume poultry products. Thus, even if ConAgra's contention were factually accurate, the Court would still conclude that there is an identity of purchasers in this case.

In sum, the Court finds there is an identity of purchasers of the two companies' respective products. Furthermore, the Court finds that Gold Kist and ConAgra sell their respective products in similar channels of trade and distribution, and, indeed, compete for certain customers. *See Harland,* 711 F.2d at 976. This factor therefore supports a finding of likelihood of confusion.

E. *Similarity of Advertising Media Used*

The evidence clearly showed the similarity between the parties' advertising campaigns. "The greater the similarity in the campaigns, the greater the likelihood of confusion." *Exxon,* 628 F.2d at 506. The focus for this factor is on the "methods" of advertising the products, not necessarily on the precise newspapers or magazines which are used. *See Harland,* 711 F.2d at 976. In that case, the Eleventh Circuit found that the plaintiff and defendant used "virtually identical *methods* of advertising their products, relying primarily on catalogs which are available at banks. Both parties also use, to a lesser extent, advertising brochures and leaflets as well as ads in trade journals." 711 F.2d at 976–77 (emphasis added). *See also Safeway Stores,* 675 F.2d at 1166, where the court focused on the methods by which the parties advertised their services. The court there noted that the plaintiff and defendant used "large newspaper advertisements of generally similar format."

The evidence in this case showed that Gold Kist and ConAgra use exactly the same types of methods to advertise their

---

5. A compilation of the distributors which appear on both ConAgra's customer list (Plf. Ex. 47) and Gold Kist's customer lists (Plf. Ex. 34 and Def. Exs. 14 and 15) is attached hereto as Appendix A.

products. They both use promotional literature and product sheets, engage in cooperative advertisements with distributors and both promote their products through food brokers. Indeed, as discussed above, Gold Kist and ConAgra both sell MEDALLION and GOLDEN MEDALLION brand products respectively to many of the same distributors.

Because both Gold Kist and ConAgra sell their products in large urban areas, it is possible that they may overlap in some of their newspaper and other print media advertisements. In fact, because Gold Kist and ConAgra sell to distributors within the same market area, it is possible that these distributors may each produce promotional material in their market bearing the MEDALLION and GOLDEN MEDALLION trademarks. There is thus a considerable likelihood that Gold Kist's and ConAgra's advertising may directly overlap in certain market areas. This factor weighs in favor of a finding of likelihood of confusion.

### F. *Defendant's Intent*

Although Gold Kist did not introduce evidence of ConAgra's intent to trade off on Gold Kist's MEDALLION trademark, it is not necessary for Gold Kist to present any evidence of ConAgra's intent in order to prevail on its claim of infringement. *See, e.g., Safeway,* 675 F.2d at 1167; *Exxon,* 628 F.2d at 506. In any event, ConAgra did not present any explanation of its choice of the GOLDEN MEDALLION trademark despite the existence of the MEDALLION mark.

It is not disputed that ConAgra, through its counsel, was aware of the existence of Gold Kist's registrations prior to the time it adopted the GOLDEN MEDALLION trademark. There was no evidence that those who chose the name were actually aware of the Gold Kist mark, however. Therefore, the Court finds that ConAgra's choice of labels was not made in bad faith, although it may have been negligent.

### G. *Actual Confusion*

Gold Kist did not present any evidence of actual confusion in this case. Although this factor is relevant, it is well established that it is not necessary for Gold Kist to introduce *any* evidence of actual confusion in order to prevail—the test is a likelihood of confusion. *Remy Martin,* 756 F.2d at 1529.

Moreover, courts have acknowledged that it is extremely difficult to obtain evidence of actual confusion, particularly when the products are relatively inexpensive,[6] nearly identical, and when the period of concurrent use is short. *AmBrit, Inc. v. Kraft, Inc.,* 805 F.2d 974, 987 (11th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,* 659 F.2d 695, 704 (5th Cir. Unit A 1981), *cert. denied* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982).

### H. *The Trademark Office's Decision to Allow ConAgra to Register the GOLDEN MEDALLION Trademark*

ConAgra argued that the decision of the United States Patent & Trademark Office (the "Trademark Office") to allow ConAgra to register its GOLDEN MEDALLION trademark is a factor which weighs against a finding of likelihood of confusion. Of course, the Court is not bound by the Trademark Office's decision and is free to make its own decision. *See Miss Universe, Inc. v. Little Miss U.S.A., Inc.,* 212 U.S. P.Q. 425, 427–28, n. 6 (N.D.Ga.1981) (permanent injunction); *Miss Universe, Inc. v. Little Miss U.S.A., Inc.,* 212 U.S.P.Q. 423, 424 n. 1 (N.D.Ga.1980) (preliminary injunction). The only question is how much weight is to be afforded to the Trademark Office's decision.

The proceeding to register the GOLDEN MEDALLION trademark in the Trademark Office was not adversarial in nature; Gold

---

6. In fact, because the goods at issue here are relatively inexpensive, buyers are less likely to take care in selecting the products, thereby increasing the likelihood of confusion. *See Sun-*

*Fun Products, Inc. v. Suntan Research and Development, Inc.,* 656 F.2d 186, 191 (5th Cir. Unit B 1981).

Kist did not have an opportunity to object to the registration or to present any evidence opposing the registration. Gold Kist's only opportunity to do so would have been in the opposition proceeding which has been stayed pending a determination by this Court.

Thus, the Trademark Office did not have the opportunity to evaluate all of the evidence relevant to the factors the Court must consider in determining whether there is a likelihood of confusion. Because the Trademark Office's decision was not based on anything resembling a complete evidentiary record, the Court gives no weight to its decision.

### I.  *Weighing of the Factors*

█ Weighing all of the foregoing factors together, it is clear in this case that ConAgra's use of the GOLDEN MEDALLION trademark is likely to cause confusion with Gold Kist's MEDALLION trademark. Most of the factors strongly support a finding of a likelihood of confusion: (1) MEDALLION is a strong trademark entitled to broad protection; (2) the two trademarks are very similar in sight, sound and meaning, and create a very similar overall commercial impression; (3) the products identified by the trademarks are very similar or identical; (4) there is an identity of purchasers and the methods used to distribute the products are identical; and (5) Gold Kist and ConAgra use precisely the same type of advertising campaigns and methods for their respective marks. The only factors which weigh against a finding of likelihood of confusion are lack of evidence of actual confusion or direct evidence of intent and the decision by the Trademark Office to register the GOLDEN MEDALLION trademark. The balance of these factors tips overwhelmingly in favor of Gold Kist. A finding of trademark infringement is therefore appropriate.

The Court would reach the same conclusion even if it had determined that MEDALLION was a "weak" rather than "strong" trademark. The other factors which the Court must consider—the similarity of marks, the identity of products, purchasers and methods of distributions and the types of advertising done for the marks—weigh so strongly in favor of a finding of likelihood of confusion that the outcome would have been no different. However, the record clearly supports a finding that the MEDALLION trademark is, indeed, strong and entitled to broad protection.

Gold Kist's claims under § 43(a) of the Lanham Act, the Georgia Uniform Deceptive Practices Act, O.C.G.A. § 10–1–370, the Georgia Fair Business Practices Act of 1975, O.C.G.A. § 10–1–390, the Georgia False Advertising Statute, O.C.G.A. § 10–1–421, and the common law for trademark infringement and unfair competition all involve essentially the same test as the test under § 32 of the Lanham Act. *See University of Ga. Athletic Ass'n v. Laite,* 756 F.2d 1535, 1539 (11th Cir.1985); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258–259 (5th Cir.), *cert. denied* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). Therefore, the Court's finding of a likelihood of confusion leads the Court to conclude that Gold Kist has prevailed on the other counts of its complaint as well.

### DAMAGES

Generally, damages for infringement under the Lanham Act may include "(1) the defendant's profits, (2) any damages sustained by plaintiff, and (3) the cost of the action." *Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562, 1564 (11th Cir. 1986). In order to obtain an award of actual damages, plaintiff must produce some evidence of actual loss, although the amount may be determined through just and reasonable inference. *Id.* at 1565.

At this point the Court has no evidence of any damages incurred by plaintiff due to defendant's actions. The Court will allow plaintiff to offer evidence of damages or argue that evidence presented supports an award of a specific amount of damages.

█ To be awarded defendant's profits, plaintiff need not demonstrate actual loss. *Burger King Corp. v. Mason,* 855 F.2d 779 (11th Cir.1988). The purpose of awarding

**1304**

profits is to make infringement unprofitable, to deprive defendant of any unjust enrichment and to deter similar activity in the future. *Id.* Unlike many courts, the Eleventh Circuit does not require a higher showing of culpability, e.g., bad faith, malice, etc., in order to recover profits. *Burger King*, 855 F.2d at 781. *But see, Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 641 (D.D.C.1982). An award of profits is within the trial court's broad discretion, based on its analysis of the particular conduct involved. *Burger King*, 855 F.2d at 782. Profits to be recovered must come from sales made by defendants to purchasers who sought to buy plaintiff's products and instead bought defendant's products. *St. Charles Manufacturing Co. v. Mercer*, 737 F.2d 891 (11th Cir.1983).

■ In this case, there has been no evidence of any actual confusion or any attempts to buy plaintiff's products when defendant's products were substituted for them. The purpose of this injunction is to prevent such an occurrence, which appears likely in the near future. Therefore, the Court will not award an accounting of defendant's profits.

■ Finally, attorneys fees are awarded only in exceptional circumstances. *Foxtrap*, 671 F.2d at 706. The legislative history shows that attorneys fees should be awarded only in cases "characterized as malicious, fraudulent, deliberate, and willful." S.Rep. No. 93–1400, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 7132, 7136. *See St. Charles Manufacturing*, 737 F.2d at 894. Because the Court found no evidence of bad faith or malice, an award of attorney fees is not appropriate in this case.

### CONCLUSION

■ Accordingly, the Court finds that by adopting and using the trademark GOLDEN MEDALLION on its frozen poultry products, ConAgra has infringed Gold Kist's MEDALLION trademark and has engaged in unfair competition and deceptive trade practices. Gold Kist, therefore, is entitled to permanent injunctive relief.

Pursuant to this finding, the Court hereby orders that:

(1) ConAgra, and its agents, employees, officers, servants, and all persons in active concert or participation with it, and each of them, and their successors and assigns, be permanently enjoined:

(a) From further use of the name "GOLDEN MEDALLION" either alone or in combination with other words, in the conduct of its business, or as a trademark for products it sells or offers for sale or otherwise as a designation of the source of the poultry products it provides;

(b) From otherwise engaging in unfair and deceptive trade practices and unfair competition; and

(c) From further damaging Gold Kist's goodwill and reputation or the distinctiveness of Gold Kist's trademark;

(2) ConAgra be permanently enjoined from deceiving the public and competing unfairly with Gold Kist by advertising, promotion and offering poultry products of any type utilizing the trademark "GOLDEN MEDALLION" or any variations thereof which are confusingly similar to Gold Kist's trademark;

(3) ConAgra deliver up for destruction by Gold Kist all advertising and promotional materials, displays, business stationery and calling cards, and any and all other printed matter of any type, including the plates or other means for producing the same, which bear on the infringing and unfairly competing indicia consisting of the trademark "GOLDEN MEDALLION" or any other variation thereof which are colorable imitations of, or confusingly similar to Gold Kist's trademark;

(4) Gold Kist submit a brief and affidavits within thirty days of the date of this order to show losses incurred due to ConAgra's infringement; defendant may object by brief and affidavit within fifteen days of the filing of plaintiff's proof, and if either party feels that an evidentiary hearing is necessary they should request one in their brief; and

(5) ConAgra pay to Gold Kist its costs in this action.

IT IS SO ORDERED.

## APPENDIX A

### DISTRIBUTORS SERVICED BY GOLD KIST AND CONAGRA

1. Adcock Distributing
P.O. Box 5671
Shreveport, LA 71135

2. American Food Service
4721 Simonton
Dallas, TX 75244

3. Armour & Co.
P.O. Box 33309
Charlotte, NC 28233

4. Armour & Co.
520 Kamakee Street
Honolulu, HI 96814

5. Armour & Company
241 West Jackson
Phoenix, AZ 85030

6. Associated Grocers
P.O. Box 1748
Baton Rouge, LA 70821

7. Associated Food Stores
a/k/a Associated Grocers
P.O. Box 7248
Boise, ID 83707

8. Associated Grocers of Manchester
P.O. Box 5200
725 Gold Street
Manchester, NH 03105

9. Associated Food Stores
P.O. Box 30430
Salt Lake City, UT 84130

10. Atlanta Fish
4795C Fulton Industrial
Atlanta, GA 30336

11. Bayou Foods
1021 St. Ferdinand Street
New Orleans, LA 70117

12. Bigger Bros.
P.O. Box 4213
Charlotte, NC 28234

13. Bob Blanke Sales
1545 Helton Drive
Florence, AL 35630

14. Carribean Ship Chandlers
8000 North West 14th St.
Miami, FL 33126

15. CFS Continental
6814 Best Friend Road
Doraville, GA 30360

16. Cochran Sysco
P.O. Box 2900
Jackson, MS 39207

17. Continental Mulberry Provision
240 Broadway Street
Macon, GA 31202

18. Divincenti Bros. Inc.
130 South 16th Street
Baton Rouge, LA 70802

19. Fleming Food Service
P.O. Box 128
Cornelia, GA 30531

20. Food Service Distributors
3625 1st Avenue South
Birmingham, AL 35222

21. Hardin Sysco Inc.
4359 B F Goodrich Boulevard
Memphis, TN 38181–0847

22. Institutional Food Co.
3808 Tarheel Drive
Raleigh, NC 27619

23. Ben E. Keith Co.
P.O. Box 2628
Fort Worth, TX 76113

24. Ben E. Keith
P.O. Box 18407
Shreavport, LA 71138

25. Kraft Inc.
P.O. Box 66305
Ohare, IL 60666

26. Lacassange Ship Suppliers
P.O. Box 51501
New Orleans, LA 70151

27. Maas Bros.
P.O. Box 13597
Tampa, FL 33611

28. Miltons Institutional Foods
Rt. 2, Box 12
Oakwood, GA 30566

29. Palmer Foods Inc.
415 Front Street, Box 760
Murfeesboro, TN 37130

30. PON Wholesale

Railroad Avenue
Ponchatula, LA 70454
31. PYA Monarch
P.O. Box 1270
Columbia, SC 29202
32. PYA Monarch
P.O. Box 869
Conway, SC 29526
33. PYA Monarch
P.O. Box 70429
Charleston, SC 29405
34. PYA Monarch
P.O. Box 668747
Charlotte, NC 28266
35. PYA Monarch
Box 1569
Greenville, SC 29606
36. Schloss & Kahn
P.O. Box 117
Montgomery, AL 36101
37. Swift Independent
7719 Garden Road
Riveria Beach, FL 33404
38. Swift
691 14th Street
Atlanta, GA 30318
39. Swift Independent
P.O. Box 6878
Jacksonville, FL 32205
40. Swift Independent
405 West 27th Street
Orlando, FL 32806
41. Swift Independent
P.O. Box 728
Plant City, FL 33566
42. Sysco Beaumont
P.O. Box 56
Beaumont, TX 77702
43. Sysco Food Service
P.O. Box 15316
Houston, TX 77220
44. Sysco Food Service
P.O. Box 18364
San Antonio, TX 78212
45. Sysco Rome
P.O. Box 2026
Rome GA 30164
46. Sysco Southeast
P.O. Box 14338

Augusta, GA 30919
47. Tennessee Hotel Supply
801 East 12th Street
Chattanooga, TN 37403
48. Texas A & M University
Agronomy Road
College Station, TX 77843
49. Valley Institutional Foods
P.O. Box 686
McAllen, TX 78501
50. W and W Meats, Inc.
2394 Canal Road
Cleveland, OH 44113
51. Weaver Poultry Co., Inc.
4112 LaGrange Street
Toledo, OH 43612
52. West Coast Grocery Co.
Oregon Division
P.O. Box 12909
Salem, OR 97309
53. West Coast Grocery Co.
Frozen Food Division
P.O. Box 2237
Tacoma, WA 98401
54. West Coast Svc. Deli Meat
Div. of Super Valu
P.O. Box 2808
Spokane, WA 99220
55. Western Foods, Inc.
P.O. Box 87
4717 Asher Ave.
Little Rock, AR 72203
56. Winn–Dixie Stores, Inc.
P.O. Box 17121
Louisville, KY 40217
57. White Rose Meat Corp.
425 Avenue P
Newark, NJ 07105
58. White Swan
P.O. Box 948
Houston, TX 77201
59. Wholesale Foods, Inc.
P.O. Box 20308
723 Basin St.
Tallahassee, FL 32304
60. Will Poultry
1075 Williams Street
Buffalo, NY 14206
61. Woodhaven Foods

P.O. Box 16703
Greensboro, NC 27402