Othal L. TURNER and On-The-Town, Inc., d/b/a Atlanta's Playboy Club, Appellants,

v.

H M H PUBLISHING COMPANY, Inc., et al., Appellees.

No. 24039.

United States Court of Appeals Fifth Circuit.

July 10, 1967.

Henry M. Hatcher, Jr., Hatcher, Meyerson, Oxford & Irvin, Atlanta, Ga., for appellants.

David J. Krupp, Chicago, Ill., Hoke Smith, Atlanta, Ga., Devoe, Shadur, Mikva & Plotkin, Chicago, Ill., Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., for appellees. Dressler, Goldsmith, Clement & Gordon, Chicago, Ill., of counsel.

Before COLEMAN and AINSWORTH, Circuit Judges, and CARSWELL, District Judge.

AINSWORTH, Circuit Judge:

HMH Publishing Company, Inc. (HMH) and Playboy Clubs International, Inc. (International), Delaware corporations, both with principal place of business in Chicago, Illinois, as plaintiffs, brought this suit against Othal L. Turner and On-The-Town, Inc., d/b/a Atlanta's Playboy Club, Georgia citizens, defendants, to enjoin the use of plaintiffs' trade and service marks by defendants in their operation of a night club and restaurant known as "Atlanta's Playboy Club."

The suit is based on diversity of citizenship (28 U.S.C. § 1332), on 28 U.S.C. § 1338 relating to actions involving trademarks, and on the Lanham Act (15 U.S.C. § 1121). It is alleged that defendants wilfully infringed on trade and service marks of plaintiff HMH, especially in the use of the trademark and service mark "Atlanta's Playboy Club" and in the use of the marks "Playboy" and "Playmate" in the conducting of a night club and restaurant. From a judgment in favor of plaintiffs, granting a permanent injunction against the use of these marks, defendants have appealed.

HMH began the publication of "Playboy" Magazine in November 1953 and registered the trademark "Playboy" for a monthly magazine on December 28, 1954 with the United States Patent Office. When defendants began the alleged unauthorized use of the name "Atlanta's Playboy Club," in April 1962, the monthly circulation of Playboy Magazine was 1,310,069 copies and when this case was tried it had reached a monthly circulation of 3,366,000. More than 170,000,000 copies have been sold. Its circulation is both nationwide and international.

Hugh M. Hefner was the organizer of HMH and is the owner of 80 per cent of its stock. He has been its president and one of its directors from the beginning. In 1957, HMH announced the intention to use its trademarks directly in the night club business. In 1959, Hefner and two associates organ-

ized Chicago Playboy Club, Inc., which later opened the first club in Chicago. In 1960, the same persons organized plaintiff Playboy Clubs International, Inc. and by agreement with HMH, International was granted an exclusive license, as master licensee, to use the HMH marks, alone or in combination, for the operation of key clubs with standards established and to be established by HMH for quality and conduct to be identified with the key clubs and the HMH marks. International was granted the right to grant sublicenses to others for the purpose of operating such clubs using the marks and subject to the approval of HMH. On February 29, 1960, Chicago Playboy Club, Inc. opened a key club named Playboy Club of Chicago under the licensing agreement described, and on May 6, 1961, a similar licensed club was opened in Florida known as Miami Playboy Club. Subsequently a license was granted to Playboy Club of Louisiana which opened the New Orleans Playboy Club on October 5, 1961. Therefore, in April 1962, when defendants opened their club in Atlanta under the name of "Atlanta's Playboy Club," the Chicago, Miami and New Orleans clubs licensed by plaintiffs were already in operation. Subsequently additional clubs have been licensed and opened in New York City, Phoenix, St. Louis, Detroit, Kansas City, Baltimore, Cincinnati, Los Angeles, Atlanta and Jamaica.

The gross receipts of International and the clubs have increased spectacularly from 1960 to 1965. International has promoted the clubs through magazine, newspaper and radio advertising, use of public relations firms, etc., and has spent a total of $5,158,088 in promotion expenses during that period. In addition to holding a registered trademark for Playboy Magazine, HMH also holds service marks for "The Playboy Club" for "operating private social clubs which feature food, drinks and entertainment" registered March 5, 1963; another mark entitled "Playboy" for "operation of establishments which feature food, drink and entertainment" registered May 12, 1964. It likewise has registered trademarks for "Playboy's Playmate of the Month," featured in the magazine "Playboy," registered May 6, 1958 and "Playmate" for calendars registered September 26, 1961, for perfume registered May 7, 1963, and for bracelets, ankle bracelets, earrings, etc. registered September 29, 1964. There are more than 440,000 members of these clubs residing in all of the states, including Georgia, who hold keys to these clubs for which they have paid $25 to $50 each. The key allows access to any of the clubs in the chain.

Defendant Turner purchased the night club known as "The Anchorage" in Atlanta in 1958, and operated it through the corporate defendant. In April 1962, the corporate defendant registered the trade names "Atlanta's Playboy Club" and "Playmate" in the Clerk's Office of the Superior Court of Fulton County (Atlanta), Georgia. At the time Turner knew of the existence of Playboy Magazine and of the Chicago and Miami Playboy Clubs which had been licensed by International. The name of "The Anchorage" was changed by defendants to "Atlanta's Playboy Club" and defendants began to advertise the club in Atlanta newspapers with a picture of a girl dressed in a costume closely resembling the famous bunny costume featured by HMH. The advertisement stated "No membership required." It was not a key club. One of the rooms in defendants' establishment at another location was called "The Playmate Lounge."

We are called upon to decide whether plaintiffs have established that the terms "Playboy" and "Playmate" have attained a secondary meaning in connection with their operation of night clubs and restaurants as to justify enjoining defendants' club from using the trade and service marks, where such use adversely affects plaintiffs' activities in interstate commerce. Also, we must decide whether under the Lanham Act (15 U.S.C. §§ 1055 and 1127) the use

of the registered marks by plaintiffs' licensees inures to plaintiffs' benefit because such licensees are "related companies" within the meaning of the Act, by virtue of the fact that the nature and quality of their goods or services are controlled by plaintiffs.

The district judge, sitting without a jury, rendered his written decision in well-reasoned, detailed findings of fact and conclusions of law. He held that Playboy Magazine had for many years enjoyed wide circulation throughout the United States (including Atlanta and the State of Georgia); that HMH had extensively advertised its trademark "Playboy" throughout the United States; had advertised and sold in interstate commerce under its trade and service marks "Playboy" services and consumer items; and that the wide publicizing of the name "Playboy" through the magazine and through the sale of these items had caused the trademark to be identified by the general public with HMH and its products. He found that in December 1959, HMH began to solicit membership applications for its Chicago Playboy Club which featured food, drink and entertainment; that a controlled license had been granted to International for the exclusive right to use and sublicense the trade and service marks of HMH to identify clubs operated in Chicago and other principal cities in the United States; that great care had been exercised in the selection of the licensees; and that HMH controlled the nature and quality of the services of the clubs so that the services would be compatible with the nature and quality of the magazine and products of HMH. The district judge held that HMH had taken an active part in promoting the clubs and that the consuming public recognized the clubs and the services of the licensee under the trade and service marks as having been approved and licensed by HMH. He also found that the mark "Playmate" had been widely publicized by HMH and International. He held that defendant changed the name of "The Anchorage" to "Atlanta's

Playboy Club" with full knowledge of the existence of the use of the trademark "Playboy" by HMH, including its use in Playboy Magazine, and with the knowledge of the existence of the Chicago and Miami Playboy Clubs franchised by International. He referred to the newspaper advertisements of defendants with the picture of a girl dressed in a costume closely resembling the bunny costume of HMH. He found that the use of the name "Atlanta's Playboy Club" was confusingly similar to the names of International's franchisees, Chicago Playboy Club and Miami Playboy Club; that telephone calls had been received by Turner and correspondence by plaintiffs which showed actual confusion by the public as to an affiliation between defendants' operation and those franchised by plaintiffs. The district court concluded that the defendants had wilfully adopted and infringed the trade and service marks of HMH with the intention of passing off their business as one licensed, sponsored, approved or connected with HMH or its nationally known magazine "Playboy" or with the clubs which it had licensed; that the continued use by defendants of the name "Atlanta's Playboy Club" would damage the rights of HMH in its marks of "Playboy" and "Playmate" because the public is likely to continue to be deceived or confused into believing there is some trade connection between plaintiffs and defendants. Accordingly, the defendants were enjoined from the use of the name "Atlanta's Playboy Club" or the use of the marks "Playboy" or "Playmate."

We are in agreement with the findings of fact of the district judge which are amply supported by the evidence, and with his conclusions of law.

■■■ Defendants contend that the trademark "Playboy" is a weak or descriptive term because it is a common word, and because of wide prior usage by other magazines and clubs; that since plaintiffs do not operate a key club but only license such clubs, they exercise no control over them and have no prop-

erty right in the trademark. Under the Lanham Act (15 U.S.C. § 1051 et seq.), registration of a trademark confers only procedural advantages and does not enlarge the registrant's rights, for ownership of the trademark rests on adoption and use, not on registration. See Faciane v. Starner, 5 Cir., 1956, 230 F.2d 732. However, the record is replete with evidence of continuous use of the marks [1] by plaintiffs who have built a national and international business reputation and have extensively publicized and promoted their trade and service marks at the cost of millions of dollars.[2] The trade and service marks "Playboy," "Playboy Club" and "Playmate" [3] have, through extensive use and promotion of plaintiffs, acquired a secondary meaning of sufficient strength to justify enjoining infringement by defendants. See North American Air. Sys. v. North American Aviation, 9 Cir., 1955, 231 F.2d 205.

The contentions of the parties as to weakness or strength (through secondary meaning) of the marks involve questions of fact implicit in the trial judge's finding of confusion,[4] and such findings unless clearly erroneous should not be disturbed. American Foods, Inc. v. Golden Flake, Inc., 5 Cir., 1963, 312 F.2d 619.

Defendants argue that there is no evidence of confusion in this case between the use of the trademark "Playboy" for a magazine, and its use by defendant for a night club; that the goods and services of each are noncompeting and, therefore, that the registered trademark is not entitled to protection. We held, however, in Chemical Corp. of America v. Anheuser-Busch, Inc., 5 Cir., 1962, 306 F.2d 433, 2 A.L.R.3d 739, that "the concept of competition with respect to the particular product need not exist to warrant actions of this kind." The argument of defendants ignores the fact that plaintiff HMH, publisher of Playboy Magazine, also holds registered service marks: "The Playboy Club" for "operating private social clubs which feature food, drinks and entertainment," and "Playboy" for "operation of establishments which feature food, drink and entertainment." We agree with the trial court's conclusion that the fact that one mark deals

---

1. The evidence is impressive that the use was in commerce as defined by Section 45 of the Lanham Act (15 U.S.C. § 1127), despite defendants' contrary argument. For example, at the date of the trial (October 20, 1965), there were 440,000 key holders in all the states, and 13,329 keys had been sold to Georgia residents (as of August 5, 1965). Billing for credit charges at all clubs was from the Chicago headquarters, across state lines. Supervision and control of nature and quality of goods and services were by persons sent from the Chicago office.

2. Defendants submitted a number of exhibits of copies of third-party registrations of trademarks of the name "Playboy" in aid of their argument that the mark "Playboy" was weak and diluted by wide usage by the public. However, defendants do not contend that their use of the term was prior to that of plaintiffs. We will not assume any knowledge on the part of the purchasing public by mere registrations in the Patent Office, nor will we assume that the marks are in continuing use, so as to have any effect on the mind of the purchasing public merely because they had been so registered. See J. C. Hall Company v. Hallmark Cards, Incorporated, C.C.P.A., 1965, 340 F.2d 960; Application of Helene Curtis Industries, Inc., 1962, 305 F.2d 492, 49 CCPA 1367.

3. Admittedly, Turner began use of both terms "Playboy" and "Playmate" at the same time. However, plaintiffs withdrew their supplemental pleading which related to the term "Playmate" only, in order to avoid a continuance of the case. Defendants say, therefore, that the term "Playmate" was not before the court and its order in this regard is erroneous. This contention disregards the fact that the pleadings which remained and which were originally filed were broad enough to include the term "Playmate," and the trial judge so ruled and received evidence as to that term also.

4. The Lanham Act (15 U.S.C. § 1114(1)(a)) provides that a person shall be liable in a civil action who shall, in commerce, use without consent of the registrant any registered mark "which such use is likely to cause confusion or mistake or to deceive purchasers as to the source or origin of such goods or services."

with a magazine and the other with a night club is immaterial since the two are intermeshed in the public mind. To the public Playboy Magazine and the several Playboy Clubs are a single business enterprise. See Esquire, Inc. v. Esquire Slipper Manufacturing Co., 1 Cir., 1957, 243 F.2d 540.

■ Defendants also contend that HMH's registry of the mark "Playboy" in connection with the operation of a night club or restaurant is void because HMH does not operate night clubs but relies for the validity of its marks on the operations of such clubs by third-party sublicensees. We look to the statute for the answer.

Section 5 of the Lanham Act (15 U.S.C. § 1055) provides:

"Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public."

The term "related company" referred to in Section 5 is defined in Section 45 of the Act (15 U.S.C. § 1127) as follows:

"The term 'related company' means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used."

Relying on the preceding sections of the Lanham Act, plaintiffs have introduced ample evidence to show that HMH fully controlled and dictated the nature and quality of the goods and services used in connection with the trade and service marks by the several licensees. When a license is granted to a franchisee, it is required to meet standards established by International which in turn are dictated by HMH. These standards relate to decor, design, quantity and quality of food, beverages and entertainment in the clubs. Each club must conform to the standards already established for existing clubs and the agreements with franchisees are made expressly subject to the terms of International's license with HMH. International hires and supervises personnel of all the clubs and the right of supervision is a continuing program.

The clubs are policed by executives of HMH and by two independent services who regularly and periodically visit the clubs and report on the maintenance of standards for food, beverages, services and decor. At HMH's direction International has prepared an operating manual for use in the clubs so each is run in exactly the same manner. All billing of club members for credit charges at the clubs is made from Chicago. HMH's service marks are, therefore, extensively used in commerce. The trial judge found —and we agree—that the nature and quality of the services rendered at the key clubs under the trade and service marks were controlled by plaintiff HMH.[5]

■ In our view, Section 5 of the Lanham Act definitely contemplates that a trade or service mark may be acquired through its use by controlled licensees, even though the registrant itself may not have used the mark. See Alligator Company v. Robert Bruce, Inc., E.D.Pa., 1959, 176 F.Supp. 377.[6]

We are, therefore, of the opinion that the judgment of the district court was correct, and it is

Affirmed.

5. Plaintiffs also point out that the record shows that HMH now owns a controlling stock interest in International and that International now owns all of the stock in the Chicago Club and the other clubs except Boston (where it owns 50%), Baltimore (5%), and St. Louis and Detroit.

6. Plaintiffs cite In re Joseph Bancroft & Sons Co., 129 U.S.P.Q. 329 (1961) in accord with this view of the law; defendants cite In re C. B. Donald Co., 122 U.S. P.Q. 401 (1959) contra.