**OCEAN BIO–CHEM, INC., Plaintiff,**

v.

**TURNER NETWORK TELEVISION, INC., Turner Broadcasting System, Inc., and Farrell/Minoff Productions, Defendants.**

**No. 90–6044–CIV.**

United States District Court,
S.D. Florida.

July 2, 1990.

John H. Oltman, Oltman and Flynn, Fort Lauderdale, Fla., for plaintiff.

Thomas R. Julin, Adalberto Jordan, Steel Hector & Davis, Miami, Fla., for defendants.

## MEMORANDUM ORDER

RYSKAMP, District Judge.

### I. INTRODUCTION

THIS MATTER is before the court on the parties' motions. Plaintiff Ocean Bio–Chem, Inc. ("Ocean") moved for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, and defendants Turner Network Television, Inc., Turner Broadcasting System, Inc., and Farrell/Minoff Productions oppose that motion. Defendants moved to dismiss Ocean's complaint for lack of subject matter jurisdiction and for failure to state a claim on which relief can be granted, pursuant to Rules 12(b)(1) and 12(b)(6); or, in the alternative, for summary judgment, pursuant to Rule 56. The court heard argument from the parties, and thereafter Ocean moved for leave to file a supplemental affidavit and letter regarding its motion for a preliminary injunction and for a supplemental hearing on that motion.

The court grants Ocean's motion for leave to file a supplemental affidavit and letter. However, a supplemental hearing is unnecessary, and the court thus denies that motion. For the reasons discussed below, the court denies Ocean's motion for a preliminary injunction, denies defendants' motion to dismiss the complaint, and grants defendants' alternative motion for summary judgment as to Count I of the complaint. The court declines to exercise pendent jurisdiction over the state claims presented by Counts II and III of the complaint and thus dismisses those counts.

### II. BACKGROUND AND PROCEDURAL HISTORY

Ocean's three-count complaint against defendants alleges (1) misrepresentation of its trademark and trade name in violation of 15 U.S.C. § 1125(a) (1988), the codification of the Lanham Trade–Mark Act;[1] (2) injury to business reputation in violation of Fla.Stat. § 495.151 (1989); and (3) dilution of trademark and trade name in violation of Fla.Stat. § 495.151 (1989). Ocean alleges that it was injured when defendant Turner Network Television, Inc. broadcast "Incident at Dark River," a fictional television movie produced by defendant Farrell/Minoff Productions. The movie, first broadcast December 4, 1989, portrayed a father's anguish over his daughter's death, which was caused by the river pollution of a company called "Starbrite Batteries." The movie was aired four times before this action was filed.

Ocean does not produce batteries. But from November 1973 until October 1974, Ocean existed as Star Brite Corporation; its wholly-owned subsidiary Star Brite Distributing, Inc. still uses that name. Ocean claims to market 168 different products under the Star Brite trademark, including marine and automotive cleaners and polishes. Star Brite products, which have been sold since 1972, are alleged to approximate seventy percent of the market share of polishes for boats and recreational vehicles.

Although "Incident at Dark River" was a movie about a battery manufacturer, Ocean alleges that defendants' movie made use of its trade name and trademark and created a likelihood of confusion with its products. Specifically, Ocean alleges that

---

**1.** In this circuit, some question exists as to whether trade names are protected by the Lanham Act. *American Television and Communications Corp. v. American Communications and Television, Inc.,* 810 F.2d 1546, 1548 n. 1 (11th Cir.1987). In *American Television and Communications Corp.,* the Eleventh Circuit declined to resolve an apparent conflict in the case law, because the district court required that the plaintiff prove its trade name acquired secondary meaning under either § 1125 or Florida common law. In this case, Ocean has not attempted to prove that its trade name has acquired secondary meaning or to argue that § 1125 protects trade names. Accordingly, the court focuses on whether defendants' use of Starbrite Batteries as the tradename of a fictional company infringes on Ocean's trademark.

the movie makes repeated reference to the fictional company as merely Star Brite, instead of Star Brite Batteries, and portrays the Star Brite trademark visually in two scenes, in a sign over a factory gate and in a newspaper headline.

Beyond creating a likelihood of confusion, Ocean claims that the movie has already created actual confusion, as one potential customer has refused to purchase products from Ocean because "it was dumping toxic chemicals into a river." According to Ocean's president, the false impression created by the television movie unfairly injured its business reputation and diluted its trademark, because the company has exercised care to be environmentally conscious.

Ocean seeks an injunction against future broadcasts of the movie. The Turner Network has delayed additional broadcasts pending the outcome of this litigation, although the movie is scheduled for distribution on the home video market in October 1990 and is being considered for possible international syndication.

Defendants oppose Ocean's motion for an injunction, arguing that Ocean cannot succeed on its claims. Defendants also move to dismiss the complaint or, in the alternative, for summary judgment.

## III. ANALYSIS

### A. General Standards for a Preliminary Injunction.

■ Both the federal and Florida law on which Ocean relies provide for injunctive relief. Under the federal trademark act, a district court has the power to grant an injunction to prevent the violation of any right of a registrant who has registered its mark with the United States Patent and Trademark Office or to prevent a violation of section 1125. 15 U.S.C. § 1116 (1988). The very terms of the Florida antidilution statute allow for injunctions to issue.

To prevail in federal court on its motion for a preliminary injunction, Ocean must establish that (1) it has a substantial likelihood of success on the merits of its claims; (2) a substantial threat exists that it will suffer irreparable injury if injunctive relief is denied; (3) the threatened injury to Ocean outweighs the threatened harm the injunction may do to the defendants; and (4) granting a preliminary injunction will serve the public interest. *Tally–Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1022 (11th Cir.1989). In determining the propriety of an injunction in a trademark case, the critical issue is whether the plaintiff is likely to succeed on the merits of its claim, as "the other decisions will flow from that ruling." *Keds Corp. v. Renee Intern. Trading Corp.*, 888 F.2d 215, 220 (1st Cir.1989).

### B. Whether Ocean States a Cause of Action Under the Lanham Act.

■ Defendants move to dismiss Ocean's complaint, arguing that because the allegedly infringing use occurred in a fictional context the first amendment precludes Ocean from stating a cause of action under the Lanham Act. While first amendment concerns affect application of trademark law, the first amendment does not insulate artistic works from Lanham Act claims. *Cliff's Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490, 493 (2d Cir.1989) (citing *Silverman v. CBS, Inc.*, 870 F.2d 40, 49 (2d Cir.1989), *cert. denied*, —— U.S. ——, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989)); *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989); *see also Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402–03 (8th Cir. 1987), *cert. denied*, 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988) (issuance of injunction did not infringe on first amendment protections, because injunction directed against marketing of T-shirts, mugs, and other products featuring design with phrase "Mutant[s] of Omaha" to express opposition to nuclear arms). Thus, Ocean is not precluded as a matter of law from asserting a Lanham Act claim against use of its trademark associated with a fictional work, and defendants' motion to dismiss plaintiff's complaint must be denied.

■ Notwithstanding, defendants' fictional film is entitled to the full extent of protection afforded by the first amend-

ment.[2] When first amendment values are involved, the Lanham Act must be construed narrowly. *Cliff's Notes,* 886 F.2d at 494–95 (vacating Lanham Act injunction against publication of study guide parody satirizing bestseller novels, noting "somewhat more risk of confusion is to be tolerated when a trademark holder seeks to enjoin artistic expression").

### C. Likelihood of Confusion Under the Lanham Act.

In the first count of Ocean's complaint, it seeks recovery under 15 U.S.C. § 1125(a), which forbids false designations of origin and false descriptions. Section 1125 provides that:

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, of any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act.

15 U.S.C. § 1125(a) (1988).

■ To prevail under section 1125(a), a plaintiff must demonstrate (1) that it is the prior owner of the trademark, and (2) that the defendant adopted a trademark that is the same or confusingly similar, so that consumers likely will be confused about "the proper origin of the goods or services, such that a consumer is likely to believe that defendant's goods or services are being sold with the consent or authorization of the plaintiff, or that defendant is affiliated with or connected to the plaintiff." *American United Life Ins. v. American United Ins. Co.,* 731 F.Supp. 480, 485 (S.D. Fla.1990) (citing *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984)); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 839 (11th Cir.1983) (dispositive issue under § 1125(a) whether consumers likely to confuse defendant's products "as being rendered, authorized, sponsored, or endorsed" by plaintiff).

There is no question that Ocean is the prior owner of the Star Brite trademark. The critical question is whether Ocean has shown that defendants' offending use creates a likelihood of confusion with the Star Brite mark. *John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 972 (11th Cir.1983). The Eleventh Circuit has identified various factors to consider when determining whether a likelihood of confusion exists: (1) the type of mark, (2) the similarity of the marks, (3) the similarity of the parties' products or services, (4) the similarity of the parties' retail outlets and customers, (5) the similarity of the advertising media used, (6) the defendant's intent, and (7) the actual confusion engendered by the parties' uses. *Dieter v. B & H Industries of Southwest Florida, Inc.,* 880 F.2d 322, 326 (11th Cir.1989), *petition for cert. filed,* — U.S. —, — S.Ct. —, — L.Ed.2d — (U.S. Dec. 16, 1989) (No. 89–1193); *Freedom Savings and Loan Ass'n v. Way,* 757 F.2d 1176, 1182 (11th Cir.1985), *cert. denied,* 474 U.S. 845, 106 S.Ct. 134, 88

---

**2.** The court does not consider persuasive Ocean's argument that defendants' speech is commercial speech merely because defendants seek to profit from their expressive activities. The logical extension of this argument would render the publishing and movie industries entitled to only the limited protection accorded to commercial speech. Commercial speech is narrowly defined as that which proposes a commercial transaction. *Board of Trustees of State University of New York v. Fox,* — U.S. —, 109 S.Ct. 3028, 3036, 106 L.Ed.2d 388, 399 (1989). It is well established that movies are fully protected expression. *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501–02, 72 S.Ct. 777, 780, 96 L.Ed. 1098, 1105–06 (1952).

L.Ed.2d 110 (1985).[3]

■ Of these seven factors, the two most important are the type of mark and the actual confusion engendered by the parties' uses. *Dieter*, 880 F.2d at 326; *Freedom Savings and Loan Ass'n*, 757 F.2d at 1186. All factors are to be weighed together. *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1533 (11th Cir.1985), *reh'g denied*, 765 F.2d 154 (11th Cir.1985). Finally, a court need not consider all factors in every case, and the proper resolution of some cases may require that the court consider additional factors. *Swatch Watch, S.A. v. Taxor, Inc.*, 785 F.2d 956, 958 (11th Cir. 1986). In this case, the parties concede the inapplicability of factors four and five, regarding the similarity of the parties' retail outlets and customers and the similarity of advertising media used.

■ 1. *Type of trademark.* Federal trademark law provides the greatest protection to strong trademarks. *Freedom Savings and Loan Ass'n*, 757 F.2d at 1182. The strength of a mark depends on its distinctiveness and on the extent to which third parties have used it. *John H. Harland Co.*, 711 F.2d at 973–975. When evaluating a mark's strength for purposes of a "likelihood of confusion" determination, this court also must consider whether the mark has been declared "incontestable" under 15 U.S.C. § 1065(3). *Dieter*, 880 F.2d at 328–29.[4]

■ The distinctiveness of a mark has been characterized as "its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). Trademarks are divided into four categories of distinctiveness; in descending order of strength, the categories are arbitrary or fanciful marks, suggestive marks, descriptive marks, and generic marks. *Dieter*, 880 F.2d at 327–28; *Bell Laboratories, Inc. v. Colonial Products, Inc.*, 644 F.Supp. 542, 544–45 (S.D. Fla.1986). Arbitrary marks are words in common usage used for a product unrelated to their meaning or words created by the trademark owner. *Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1537, n. 20 (11th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987). An example of an arbitrary mark would be a computer-generated name like Exxon. *Bell Laboratories, Inc.*, 644 F.Supp. at 545. "Suggestive marks subtly connote something about the [product] so that a consumer could use his or her imagination and determine the nature of the [product]. The term 'Penguin' would be suggestive of refrigerators." *Ambrit, Inc.*, 812 F.2d at 1537 n. 20. "Merely descriptive" marks describe a characteristic or quality of the product, such as "Vision Center" for an eyeglass store. *Id.* This type of mark can

---

3. The likelihood of confusion test also is used for claims of trademark infringement under 15 U.S.C. § 1114. The same factors are relevant to establishing a claim under either section. *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503–04 (11th Cir.1985) ("identical" factors relevant to *establishing* violations of 15 U.S.C. § 1114 and § 1125(a)), *cert. denied*, 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 306 (1986); *Freedom Savings and Loan Ass'n*, 757 F.2d at 1186 (claim under § 1125 is broader than that under § 1114, but same considerations apply). The court will consider cases decided under both sections in determining whether a likelihood of confusion exists in this case. *Conagra, Inc.*, 743 F.2d at 1512 n. 2; *Jellibeans, Inc.*, 716 F.2d at 839 n. 15.

4. Under § 1065(3), the holder of a mark may have it declared incontestable by filing the required affidavit five years after registering the

mark. Incontestable status provides conclusive evidence of the registrant's exclusive right to use the registered mark, subject to §§ 15 and 33(b) of the Lanham Act. *Park 'N' Fly, Inc. v. Dollar Park and Fly*, 469 U.S. 189, 192, 105 S.Ct. 658, 660, 83 L.Ed.2d 582, 586 (1985).

The Eleventh Circuit in *Dieter* held that "incontestable status is a factor to be taken into consideration in likelihood of confusion analysis." *Dieter*, 880 F.2d at 329. This court interprets *Dieter* to require district courts to consider incontestability as a factor in determining the mark's strength and not as a separate factor distinct from the seven factors used in this circuit to determine likelihood of confusion. *See id.* at 328 ("Whether 'incontestable' status affects the *strength* of the mark for purposes of 'likelihood of confusion' determinations was left open to question by *Park 'N' Fly*. This is an issue of first impression in this circuit.") (emphasis in original).

be registered only if it has acquired secondary meaning; that is, if it "has become distinctive of the applicant's goods in commerce." 15 U.S.C. §§ 1052(e), (f); *Park 'N' Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582, 587 (1985). Common descriptive marks are referred to as generic marks, as identifying the genus or class to which the product belongs, and do not receive trademark protection. *Park 'N' Fly, Inc.*, 469 U.S. at 194, 105 S.Ct. at 661, 83 L.Ed.2d at 587. The distinctiveness of a mark is to be determined contextually, by referring to the goods or services for which it is used. *Bell Laboratories, Inc.*, 644 F.Supp. at 545.

 Ocean argues that its mark is arbitrary and hence entitled to the highest degree of protection. Defendants contest that designation, suggesting that Ocean's mark is "at best, ... a far weaker descriptive or suggestive mark." The court agrees with defendants that Ocean's mark is not arbitrary. Instead, the mark exhibits characteristics of both a suggestive and a descriptive mark. The term "star" is suggestive, as it requires a consumer to imagine the qualities of a star and associate those qualities with the shiny result that Ocean's products achieve. The term "brite" is descriptive of that same result.

 If Star Brite is characterized as descriptive, defendants cannot challenge the mark as being "merely descriptive" since the parties agree that it has been declared incontestable. *Park 'N' Fly, Inc.*, 469 U.S. at 205, 105 S.Ct. at 662–63, 83 L.Ed.2d at 594. If a mark is declared incontestable, it is presumed to be at least descriptive with secondary meaning and thus a relatively strong mark. *Dieter*, 880 F.2d at 329. Notwithstanding, Ocean cannot expand its trademark "beyond the good or service for which it was originally designated" to seek injunctive relief on the ground of incontestability. *Park 'N' Fly Inc.*, 469 U.S. at 204, 105 S.Ct. at 666–67, 83 L.Ed.2d at 594. Thus, Ocean cannot use the shield of incontestability outside of the market for its automotive and aircraft polishes and cleaners, the only products that

Ocean has registered under the Star Brite mark.

 But beyond the limited protection afforded by incontestable status, Ocean's trademark rights "are not limited to the goods specified in the certificates of registration, but extend to 'any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.'" *E. Remy Martin & Co.*, 756 F.2d at 1530. The court determines it unlikely that ordinary prudent purchasers will connect the various products marketed under the Star Brite name to fictional batteries. *Bonaventure Associates v. Flyer Publishing Corp.*, 621 F.Supp. 107, 108 (S.D.Fla. 1985) (reaction of "ordinary prudent purchasers" focus of determining likelihood of confusion) (citing *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir.1985)). Nearly all Star Brite products are polishes or cleaners, although Ocean also produces a flexible vinyl to protect rope and a liquid electrical tape. None of these products are related to batteries, nor does the court consider persuasive Ocean's argument that because some Star Brite products are used on automotive and marine engines that "puts them very close to engine batteries."

 Also, outside of the polish and cleaner market, Ocean receives only limited protection for the Star Brite mark, whether characterized as suggestive or descriptive, if third parties have made extensive use of the same or a very similar trademark. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259–60 (5th Cir.1980), *reh'g en banc denied*, 617 F.2d 295 (5th Cir.1980), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). According to an affidavit submitted by defendants, marks identical to or very similar to Star Brite are registered by numerous companies for numerous products both in Florida and nationwide, involving variants such as Star Bright, Starbright, and Brite Star. Such terms are registered with the United States Patent and Trademark Office as a trademark or part of a trademark for 22 diverse products and services, including floor tiles, watch components, chewing gum, soft

drinks, and teeth whitener. Such terms are also registered in 11 different states for diverse products and services including cleaning services, music and design services and satellite antenna sales. In addition to these registrations, various companies in Florida and nationwide use terms similar to Star Brite in their company names. Fifty-two companies in Florida have or do use "Starbrite" or "Star Bright" as a company name. Nationwide, this category includes 153 companies, 84 of which use "Starbrite" or "Star Brite" and 79 of which use "Starbright" or "Star Bright." It appears that until defendants broadcast "Incident at Dark River," Ocean did not contest such third party usage. The fact that Ocean has never previously contested third parties' use of marks similar to its own weighs in defendants' favor. *Freedom Savings and Loan Ass'n,* 757 F.2d at 1182.

These extensive third party registrations are entitled to considerable weight in determining the strength of Ocean's mark. *Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Ass'n,* 651 F.2d 311, 316 (5th Cir.1981) ("impressive evidence" of no likelihood of confusion in that 4400 businesses using Sun registered with Florida Secretary of State and that businesses nationwide had registered Sun as trade or service marks); *Amstar Corp.,* 615 F.2d at 259–60 (third party use of identical or similar trademarks on different goods, as evidenced by 72 trademark registrations, entitled to great weight in determining no likelihood of confusion). This is true regardless of whether Ocean's mark is classified as suggestive or descriptive, or even if it were an arbitrary mark. Consequently, the court declines to determine whether Ocean's trademark properly is classified as suggestive or descriptive or an amalgam of the two.

In concluding that third party registrations should be considered when assessing a trademark's strength, the court declines to follow *Gold Kist v. Conagra,* 708 F.Supp. 1291, 1298 (N.D.Ga.1989). In *Gold Kist,* the district court ruled that evidence of third party registrations was insufficient to weaken the strength of a mark, if the defendant did not introduce evidence that

"clearly establishes that these alleged third-party marks are in fact in use." *Id.* (citing *Turner v. H.M.H. Publishing Co.,* 380 F.2d 224, 228 (5th Cir.1967), *cert. denied,* 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967) and *Miss Universe, Inc. v. Little Miss USA, Inc.,* 212 U.S.P.Q. (BNA) 425, 429 (N.D.Ga.1981)). It is true that the former Fifth Circuit in *Turner* refused to assume that the purchasing public would know about third-party marks registered in the Patent Office but not necessarily in use. *Turner,* 380 F.2d at 228 n. 2. Notwithstanding, the former Fifth Circuit in more recent decisions considered registrations standing alone as evidence of third party use. *Sun Banks of Florida, Inc.,* 651 F.2d at 316; *see also Amstar Corp.,* 615 F.2d 252 at 260 ("third-party uses and registrations ... limit protection to be accorded plaintiff's mark outside the uses to which plaintiff has already put its mark").

■■■■ *2. Similarity of the marks.* The greater the similarity between two uses of a trademark, the greater the likelihood of confusion. Ocean points to both visual and aural similarities between its mark and the defendants' challenged use. When determining similarity, the court must consider overall design and not compare individual features. *Sun Banks of Florida, Inc.,* 651 F.2d at 318 (citing *Amstar Corp.,* 615 F.2d at 260–61).

■■■ As to visual similarity, Ocean claims that defendants have shown Star Brite in a newspaper and on a sign in the movie and that the representation is "almost identical" to Ocean's trademark. Overall, the court determines that the visual representation of the marks is insufficiently similar to cause confusion. Defendants' use in the newspaper article appeared in headline type not in the stylized lettering that Ocean has trademarked. The logo used in the sign of the fictional company is also conspicuously different from that of Ocean: the fictional logo is one word, not two, and contains no star in the letter "a" of Star, as does that of Ocean.

As to aural similarity, Star Brite and the name used for the fictional company are similar, if not identical, in sound. When subjected to an auditory characteristics test, "Starbrite," without the addition of "Batteries," is indistinguishable from Star Brite. *Bell Laboratories, Inc.,* 644 F.Supp. at 546. Notwithstanding, defendants' addition of the word "Batteries" when coining the name of the fictional company helps to prevent confusion with Ocean's mark. Such minor additions may dispel any confusing similarity between the trademarks. *See id.* at 578 (addition of word Flip for rodenticide Final Flip negated confusing similarity to rodenticide Final) (quoting *Sun Banks of Florida, Inc.,* 651 F.2d 311).

3. *Similarity of the products the marks represent.* The greater the similarity between products and services, the greater the likelihood of confusion. *John H. Harland Co.,* 711 F.2d at 976. The parties disagree as to which products the court properly should compare for this prong of the likelihood of confusion analysis. Ocean argues that the proper comparison is of its products and the batteries manufactured by the fictional company in the movie. According to Ocean, the consuming public could believe that Ocean was the company represented in the movie, because the movie makes shorthand reference to the fictional company as simply Star Brite and does not clarify whether it produces only batteries. In contrast, defendants argue that the proper comparison is between Ocean's cleaning products marketed under the Star Brite name and defendants' ultimate product, the movie itself.

The court concludes that it must compare the parties' ultimate products: those that Ocean markets under the Star Brite name and the movie itself. Only this reading is consistent with the statutory language, which protects Ocean against uses of its

trademark that are "likely to cause confusion, or to cause mistake, or to deceive as to ... the origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1). Making this comparison, Ocean's and defendants' products "are not even remotely similar." *Pillsbury Co. v. Milky Way Productions, Inc.,* 215 U.S.P.Q. (BNA) 124, 134 (N.D.Ga.1981) (comparing plaintiff as producer of food products to first defendant as publisher of magazine and second defendant as vendor of books and magazines).

4. *The defendants' intent.* If Ocean could show that defendants adopted its mark with "the intent of deriving benefit" from Ocean's reputation, "that fact alone 'may be sufficient to justify the inference that there is a confusing similarity'" between the marks. *John H. Harland Co.,* 711 F.2d at 977. In this case, however, all indications are that defendants intended to portray an entirely fictional company in their movie and did not intend to misuse Ocean's trademark.

First, defendants conducted a prepublication review of "Incident at Dark River," by which they determined that Starbrite was not used for batteries and concluded that it could be used as the name of a fictional company without infringing other users' rights. Ocean concedes that defendants "have done nothing to actually pass off or palm off the company in the movie as plaintiff." The court does not consider persuasive Ocean's arguments that "extraordinary coincidences" exist between reality and fiction that suggest defendants patterned the company in their movie after Ocean.[5]

Second, defendants broadcast three specific disclaimers during the movie, which stated that it did not portray any one company and, in particular, did not portray Ocean.[6] The fact that defendants affixed

---

**5.** For example, Ocean points to the fact that its president's surname is Dornau and the surname of the fictional company president is Corman, "a similar sound," and to the fact that some of its products are produced in a town called Ferndale, whereas the movie was set in a town called Fairview. It is a logical leap to term these

"extraordinary coincidences" that evidence defendants' bad intent.

**6.** The disclaimer, in its entirety, reads as follows:

Please be advised neither the incidents or individuals portrayed in "Incident at Dark River" are based upon or intended to refer to

these disclaimers before the initial broadcast weighs in their favor. *LeSportSac Inc. v. K Mart Corp.*, 754 F.2d 71, 80 (2d Cir.1985) (equities in likelihood of confusion test under § 1125(a) different if tags affixed to handbags when first offered for sale).

Third, defendants demonstrated their good faith and lack of harmful intent when they offered to dispel any possible confusion resulting from their movie by helping write letters to Ocean's distributors. Ocean never pursued this offer.

Given these facts, Ocean has produced no evidence that defendants acted with bad intent in adopting Starbrite Batteries as the name of their fictional company.

■■■■ 5. *Actual confusion that exists.* Although actual confusion is not necessary for the Lanham Act to be violated, actual confusion is perhaps the best evidence that there is a likelihood of confusion between two trademarks. *John H. Harland Co.*, 711 F.2d at 978. Even when a disclaimer is used, the critical question remains whether the disclaimer effectively dispels a likelihood of confusion and whether actual confusion still exists. *University of Georgia Athletic Ass'n v. Laite*, 756 F.2d 1535, 1547 (11th Cir.1985) (rejecting argument that disclaimer eliminated confusion, because disclaimer relatively inconspicuous and infringing use exactly duplicated team symbol and sold as team emblem); *see also LeSportSac Inc.*, 754 F.2d at 80 (proposed tag on handbag, disclaiming association with plaintiff, removable and did not eliminate likelihood of confusion); *Wendy's Int'l, Inc. v. Big Bite, Inc.*, 576 F.Supp. 816, 825 (S.D.Ohio 1983) (surveys showed that disclaimer did not dispel confusion regarding hamburgers).

To support its claim of a likelihood of confusion despite the presence of the disclaimers, Ocean relies on a number of affidavits that purportedly demonstrate actual confusion. In the first affidavit, an Ocean sales representative states that Target Products, a California company, decided not to do business with Star Brite because it was polluting the environment. Defendants later submitted an affidavit stating that the business named in this affidavit does not exist. Ocean then attempted to rehabilitate its affidavit with another affidavit attesting to the fact that the purported buyer "planned to do business" as a company dealing in products like those Ocean produces.

Ocean also offers the affidavit of one of its South Florida distributors, who states that three of his salespersons saw "Incident at Dark River" and "[f]rom their reaction, I was concerned that there could well be some loss in sales of Star Brite Products as a result of negative publicity from the movie." After Ocean filed this affidavit, defendants filed another by the same distributor, in which he states that the sales representatives mentioned in the first affidavit "had no concern that the motion picture would result in a loss of sales once they realized that the motion picture was not referring to the Star Brite products which my store sells." Importantly, the distributor also states that none of his customers had indicated any confusion concerning Ocean's products as a result of the airing of "Incident at Dark River." After the second affidavit was filed, Ocean moved for a supplemental hearing, on the grounds that a discrepancy existed between defendants' notice of filing and the contents of the second affidavit itself, that the two affidavits were inconsistent, and that Ocean had independent evidence that defendants' counsel engaged in overreaching to obtain the second affidavit.

Finally, Ocean has submitted the affidavit of a Star Brite sales representative, who stated that the movie broadcast "has created confusion among my wholesale customers and caused them to question Star Brite products."

any actual persons, companies, products, or events.

In particular, all references in this film to "Starbrite" are not intended to refer to Ocean Bio–Chem, Inc., its subsidiaries, Star Brite

Distributing, Inc., and Star Brite Distributing Canada, Inc., or its product, "Star Brite".

All such references to any such person, companies, or products is purely coincidental.

As a preliminary matter, defendants object to admission of any of these affidavits, on the ground that they contain hearsay statements offered for the truth of the matter asserted therein. If hearsay, the affidavits would be inadmissible to support Ocean's motion for a preliminary injunction or to combat defendants' motion for summary judgment. *See, e.g., Evans v. Wallace Berrie & Co., Inc.*, 681 F.Supp. 813, 816–17 (S.D.Fla.1988) (citing *Martin v. John W. Stone Oil Distributor*, 819 F.2d 547, 549 (5th Cir.1987)). In this case, some of the hearsay statements fall within the exception of Rule 803(3) of the Federal Rules of Evidence, as involving the declarants' state of mind. In a trademark infringement case, confusion can be shown with such hearsay statements. 4 J. Weinstein, M. Berger, D. Epstein, *Weinstein's Evidence* para. 803(3)[03] and n. 10 (1988 and Supp.1990). Accordingly, the court will analyze each affidavit individually, in terms of its admissibility and its showing of actual confusion.

First, the discredited first affidavit contains inadmissible double hearsay, in that an out-of-court declarant attests to the out-of-court statements of others. Such double hearsay is not admissible under the state of mind exception. *See Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 n. 10 (5th Cir.1982) (although testimony of plaintiff's employee regarding telephone service operator's report admissible to show reasonableness of employee's actions, not admissible to show callers' confusion between plaintiff's and defendant's goods); *Freddie Fuddruckers, Inc. v. Ridgeline, Inc.*, 589 F.Supp. 72, 76 (N.D. Tex.1984) (customer survey cards and public statements admissible to demonstrate customers' confusion regarding parties' services, because hearsay letters and statements admissible when reveal "the then existing state of mind of the writers and speakers"), *aff'd*, 783 F.2d 1062 (5th Cir. 1986); *Programmed Tax Systems, Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1131 n. 1 (S.D.N.Y.1977) (declarants may describe own state of mind regarding confusion in trademark case, but cannot describe another's state of mind).[7]

Second, the allegedly inconsistent affidavits by the distributor suffer from the same double hearsay deficiencies. Even if the affidavits were admissible, neither affidavit states that Star Brite customers were confused; in fact, the second affidavit states exactly the contrary. Even were the court to conclude from the first affidavit that Star Brite sales representatives were confused, it would not presume that Star Brite customers are or will be confused merely because Star Brite sales representatives were. *Munters Corp. v. Matsui America, Inc.*, 730 F.Supp. 790, 800 (N.D.Ill.1989). Furthermore, the court perceives no inconsistency between the defen-

**7.** A few district courts have admitted into evidence affidavits of the plaintiffs' employees, in which the employees attested to receiving phone calls from the public that demonstrated confusion regarding the parties' products or services. *Source Services Corp. v. Source Telecomputing Corp.*, 635 F.Supp. 600, 612–13 (N.D.Ill.1986); *Mile High Upholstery Fabric Co., Inc. v. The General Tire & Rubber Co., Inc.*, 221 U.S.P.Q. (BNA) 217, 222–23 (N.D.Ill.1983).

The district court in *Mile High Upholstery* relied on *Programmed Tax Systems* to admit the affidavits. *Mile High Upholstery*, 221 U.S.P.Q. at 223. This court determines that such reliance was misplaced, as the court in *Programmed Tax Systems* explicitly noted that declarants cannot attest to the out-of-court statements of others. Such an affidavit would involve double hearsay, each level of which would have to fit within a hearsay exception in order to be admissible. Other cases relied on by the court in *Source Services Corp.* involved only one level of hear-

say. *See Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir.1985) (testimony by employees about customer confusion); *Piper Aircraft Corp. v. Wag–Aero, Inc.*, 741 F.2d 925, 931 (7th Cir.1984) (expert testimony about survey methodology and responses of survey interviewees that indicated state of mind); *Armco, Inc.*, 693 F.2d at 1160 n. 10 (although testimony of plaintiff's employee regarding telephone service operator's report admissible to show reasonableness of employee's actions, not admissible to show callers' confusion between plaintiff's and defendant's goods); *Markel v. Scovill Manufacturing Co.*, 471 F.Supp. 1244, 1251 (W.D.N.Y.1979) (testimony of marketing manager that he received numerous phone calls from regional sales managers and field people concerning customer confusion; court also relied on affidavits of sales representatives, to which no hearsay objection was made), *aff'd*, 610 F.2d 807 (2d Cir.1979).

dants' notice and the second affidavit or between the two affidavits. Thus, the record contains no basis for Ocean's allegation that defendants' counsel engaged in overreaching; consequently, no supplemental hearing is necessary, and Ocean's allegations about overreaching shall be stricken.

Third, the affidavit of the sales representative also contains inadmissible double hearsay. Furthermore, even if the court considered its conclusory allegations about confusion, those allegations do not establish confusion within the legal meaning of section 1125(a). The dispositive issue under section 1125(a) is whether consumers are likely to be confused as to whether Ocean "rendered, authorized, sponsored, or endorsed" defendants' products. *Jellibeans, Inc.*, 716 F.2d at 839. This is consistent with the statutory language of the Lanham Act, which protects Ocean against uses of its trademark that are "likely to cause confusion, or to cause mistake, or to deceive as to ... the origin, sponsorship, or approval of his or her goods ... by another person." 15 U.S.C. § 1125(a)(1). Although the Eleventh Circuit has not considered how section 1125(a) applies to expressive works, the court finds persuasive another district court decision in this circuit interpreting section 1125. *Pillsbury Co.*, 215 U.S.P.Q. (BNA) at 134. In *Pillsbury*, a district court in the North-

ern District of Georgia applied the seven-factor analysis used in the Eleventh Circuit, concluding that the plaintiff could not prevail under section 1125(a) because it did not show that ordinary consumers had attributed or would attribute to it sponsorship of a pornographic representation of its trademark and trade characters. *See also Cliff's Notes, Inc.*, 886 F.2d at 494–95 (court must balance public interest in free expression with public interest in avoiding consumer confusion, while "take[ing] into account the ultimate interest in trademark law, namely, the likelihood of confusion 'as to the source of the goods in question' "); [8] *L.L. Bean, Inc. v. Drake Publishing, Inc.*, 625 F.Supp. 1531, 1533–35 (D.Me.1986) (denying summary judgment for defendant magazine publisher as survey could be interpreted as showing 11.5 percent of interviewees confused that plaintiff source of magazine parody), *rev'd on other grounds*, 811 F.2d 26 (1st Cir.1987) (reversing summary judgment for plaintiff on state antidilution claim).

Besides the affidavits, Ocean supports its motion for a preliminary injunction and opposes defendants' motion for summary judgment with a letter from K–Mart, one of its major retail distributors. The letter from K–Mart emphasizes the retailer's concern that the products it purchases from companies like Ocean be envi-

---

8. *Cliff's Notes* and other recent decisions in the Second Circuit limit *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir.1979), on which Ocean relies. Furthermore, the result in *Dallas Cowboys Cheerleaders* can be squared with the more recent decisions. The Second Circuit in *Dallas Cowboys Cheerleaders* affirmed an injunction under the Lanham Act, because it determined that consumers believed "that the mark's owner sponsored or otherwise approved of the use of the trademark" in the pornographic movie "Debbie Does Dallas," in which the star donned plaintiff's trademarked uniform. *Id.* at 205. As part of its determination, the court considered advertising used to market the movie, which included "marquee posters depicting Debbie in the allegedly infringing uniform and containing such captions as 'Starring Ex Dallas Cowgirl Cheerleader Bambi Woods.' " *Id.* at 203. In fact, the woman who played Debbie was never a Dallas Cowboys Cheerleader. *Id.* at 203 n. 2. Subsequent Second Circuit decisions repeatedly refer to *Dal-*

*las Cowboys Cheerleaders* as a case involving "blatantly false and misleading advertising." *Silverman*, 870 F.2d at 48 n. 5; *Rogers*, 875 F.2d at 999 n. 4.

In this case, defendants have not used Ocean's trademark to market the movie in a false and misleading manner, as in *Dallas Cowboys Cheerleaders*. Ocean initially alleged that Turner advertised the movie with a preview that "indicated several times that 'Starbrite' had caused a child's death." Even if such a preview had aired, it is unlikely that it would cause confusion within the legal meaning of § 1125(a), which requires confusion as to source or sponsorship. *See, e.g., Pillsbury Co.*, 215 U.S.P.Q. (BNA) at 134. Furthermore, Ocean's president later testified that this promotional did not exist and that this sentiment was only a distributor's purported reaction to the film. If anything, defendants took pains to disassociate Ocean from their film, by airing three separate disclaimers that specifically noted that the company portrayed was not Ocean.

ronmentally sound. The court is at a loss as to how the K–Mart letter proves that actual confusion exists. The letter does not state that K–Mart believes that Ocean is an environmental polluter as a result of confusion arising from defendants' film or that K–Mart believes that Ocean sponsored the film; in fact, the K–Mart letter does not even mention the film.

Ocean has failed to show actual confusion exists. The K–Mart letter shows no confusion of any sort. Assuming arguendo that the affidavits are admissible in their entirety, they show no actual confusion within the legal meaning of section 1125(a).

■■■ 6. *Weighing of the Lanham Act Factors.* Weighing these seven factors, it is clear that Ocean has failed to show a likelihood of confusion within the meaning of section 1125(a) of the Lanham Act. Although Ocean's mark is relatively strong, third party registrations for the same or similar marks dilute that strength outside of the market for Ocean's products. Although the trademarks are audibly the same, defendants have added a word, which helps dispel confusion, and visually the logos used are dissimilar. The products that the parties produce are entirely different. The parties concede the inapplicability of the factors involving retail outlets and customers and advertising media. No evidence exists of bad intent on the part of defendants. Most importantly, absolutely no evidence exists that ordinary prudent consumers are likely to be confused about whether Ocean authorized or sponsored defendants' movie.

For the foregoing reasons, Ocean is not entitled to a preliminary injunction under section 1125(a). To the contrary, the pleadings, affidavits and other record evidence show that no genuine issue of material fact exists to be tried regarding Ocean's Lanham Act claim. Fed.R.Civ.P. 56(c). Adequate time for discovery has passed, and

Ocean has failed to make a showing that it can establish a likelihood of confusion as to the source of the movie, an element necessary to a claim under section 1125(a) and on which Ocean would bear the burden of proof at trial. *First Nat. Life Ins. v. California Pacific Life Ins. Co.,* 876 F.2d 877, 881 (11th Cir.1989) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265, 273–74 (1986)), *reh'g en banc denied,* 887 F.2d 1093 (11th Cir.1989). Accordingly, defendants are entitled to summary judgment as a matter of law on Count I of Ocean's complaint.

## D. *Florida Antidilution Statute.*

■■■ In addition to its Lanham Act claim, Ocean brings two claims under section 495.151 of the Florida Statutes, for dilution of its trademark and for injury to its business reputation. Twenty-three states, including Florida, have adopted such antidilution statutes to provide protection additional to that provided by the Lanham Act. Alexander, *Dilution—A Blessing or a Curse? What Is It?, How Do You Prove It? How Does It Fit in With Traditional Trademark Law?* (Practicing Law Institute 1988).[9]

■■■ Although some courts have treated claims under the Lanham Act and the Florida antidilution statute as coextensive, it is clear that the Florida statute involves a different inquiry. *See Tally–Ho, Inc.,* 889 F.2d at 1025 (§ 495.151 eliminates need to show competition between parties or confusion about source of goods or services, as required under Lanham Act or for common law trademark infringement) (quoting *Abner's Beef House Corp. v. Abner's Int'l, Inc.,* 227 So.2d 865 (Fla.1969)); *Community Federal Savings and Loan Ass'n v. Orondorff,* 678 F.2d 1034, 1036 n. 6 (11th

---

**9.** Unless a trademark is truly famous, the Lanham Act does not recognize dilution of the mark until it rises to the level of likelihood of confusion as to the source of the goods or services to

which the mark applies. *Community Federal Savings and Loan Ass'n v. Orondorff,* 678 F.2d 1034, 1036 n. 2 (11th Cir.1982).

Cir.1982) (dilution begins where the Lanham Act ends).

What is less clear is whether the Florida statute reaches use of a trademark in an expressive work; the reported decisions all involve use of a trademark in a commercial context. *See, e.g., Marks v. Cayo Hueso, Ltd.,* 437 So.2d 775, 777 (Fla.3d DCA 1983) (injury to developer's business reputation shown with fact its customers questioned financial soundness because of length of time defendants' development project dormant). Yet, the terms of the statute are not limited to the commercial context and could be interpreted to reach expressive works such as "Incident at Dark River." *See Pillsbury Co.,* 215 U.S.P.Q. (BNA) at 135 (under analogous Georgia antidilution statute, plaintiff entitled to relief against magazine that published representations featuring company's trade characters engaged in sexual acts, plaintiff's trademark, and its jingle refrain); *but see L.L. Bean, Inc.,* 811 F.2d at 29 (reversing summary judgment for plaintiff on Maine antidilution claim because trademark rights "extend[ ] only to injurious, unauthorized *commercial uses* of the mark by another" and parody protected by first amendment) (emphasis in original); *see generally* Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols,* 1982 Wisc.L.Rev. 158, 202 (suggesting first amendment trumps antidilution statutes when "[t]he speaker has a message, and the trademark assists in conveying it"); and Kravitz, *Trademarks, Speech, and the Gay Olympics Case,* 69 B.U.L.R. 131, 155 n. 113 (1989) (criticizing Denicola's approach as requiring content considerations and concluding that first amendment limits scope of antidilution statutes).

The lack of Florida law on this subject and the fact that summary judgment will be granted on Ocean's federal claim militates against the exercise of pendent jurisdiction over Ocean's state law claims. *In re Carter,* 618 F.2d 1093, 1104–05 (5th Cir. 1980) (determination of whether to exercise pendent jurisdiction involves consideration of factors such as "whether the federal claims were dismissed before trial, whether the state claims predominate, whether the state claims are closely tied to questions of federal policy, and whether the jury is likely to be confused by the treatment of divergent legal theories of relief"), *cert. denied,* 450 U.S. 949, 101 S.Ct. 1410, 67 L.Ed.2d 378 (1981), *cited in Rutledge v. Aluminum, Brick & Clay Works, Int'l,* 737 F.2d 965, 970 (11th Cir.1984). The court heeds the Supreme Court's admonition that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966).

Neither do considerations of judicial economy and convenience weigh in favor of exercising pendent jurisdiction. The vast majority of the work expended by the parties and the court has concerned the federal question presented in Count I of Ocean's complaint; indeed, the parties' briefs do not address adequately how the Florida statute has been applied and how that application would be affected by first amendment concerns. Nothing in the record indicates that Ocean would be prejudiced by dismissal of its state claims or that it will be unable to pursue those claims in a Florida court. Accordingly, the better exercise of discretion "would seem to permit, if not require, the dismissal of plaintiff's [state law] claims under the circumstances." *Smith v. Weinstein,* 578 F.Supp. 1297, 1306 (S.D.N.Y.1984) (dismissing without prejudice state law claims after entering summary judgment for defendant on plaintiff's copyright claim), *aff'd,* 738 F.2d 419 (2d Cir.1984).

## IV. CONCLUSION

Accordingly, after consideration of the parties' motions and the record and law in this matter, it is hereby ORDERED and ADJUDGED that:

(1) plaintiff's motion for a preliminary injunction is DENIED;

(2) plaintiff's motion for a supplemental hearing regarding its motion for an injunction is DENIED;

(3) plaintiff's allegations as to alleged overreaching on the part of defendants' counsel shall be stricken;

(4) plaintiff's motion for leave to file a supplemental affidavit is GRANTED;

(5) defendants' motion to dismiss the complaint is DENIED;

(6) defendants' motion for summary judgment is GRANTED, as to count I of the complaint premised on 15 U.S.C. § 1125(a); and

(7) the state law claims in Counts II and III of the complaint are DISMISSED without prejudice to their assertion in an appropriate Florida court.

DONE and ORDERED.